## THE TOWNS OF GROTON AND LEDYARD *vs.* HURLBURT AND OTHERS.

The county court accepted a report of the county commissioners, laying out a highway, which passed through a cove, or creek, setting in from the river Thames, where, at all times, the tide ebbs and flows, but which is not navigable for any useful purpose connected with trade or agriculture, except by scows or other flat-bottomed vessels, and the passage of which up and down said cove would not be materially obstructed by a bridge placed across the same, on the line of said highway. It was held, 1. That such laying out was not exceptionable, as being an obstruction to navigation, and contrary to the constitution of the United States and the acts

of Congress. 2. That the power of laying out highways, with necessary bridges, over coves and creeks and other highways, has been delegated to the county commissioners, and consequently, that no special act of the legislature, authorizing said highway, was requisite.

The act relating to courts, (Stat. 1849, p. 220,) which disqualifies judges and justices of the peace from acting in civil actions, by reason of relationship, does not apply to the acts of commissioners, in surveying and laying out highways. Such acts are not judicial in their character, nor is a waiver of a claim, that commissioners are disqualified from acting in such cases, required by statute to be made in writing; but the same may be by matter *in pais.* Therefore, where a highway had been surveyed and laid out by county commissioners, one of whom was a brother, by marriage, of one of the petitioners, and before the hearing of the petition, the respondents had notice of such relationship, but took no exception to the action of the commissioners, on that account, until their report was presented to the court for acceptance; it was held, first, that such commissioner was not disqualified by such relationship; secondly, that the right to claim such disqualification had been waived by the respondents.

THIS was a petition, brought to the county court of New London county, by Asaph Hurlburt and others, praying for a highway, to be laid out as near the shore of the river Thames as might be found practicable and expedient, from Gale's ferry in the town of Ledyard, to the present highway, at Groton Bank, in the town of Groton.

The petition was referred to the county commissioners, who surveyed and laid out the highway, and made their report to said court, at its February term, 1851. Against the acceptance of the report, the defendants filed a remonstrance, based upon the following facts, which were found by the court upon the hearing. Said petition was heard and decided by Latham Hull, Sabin K. Smith and Marshfield S. Parker, county commissioners for New London county. The highway, therein prayed for, was surveyed and laid out by two of said commissioners only—viz., Hull and Smith. Said Hull, at the time of hearing and deciding the petition, and surveying and laying out said highway, was a brother, by marriage, of William Browning, one of the signers of the petition. The respondents had notice,

before the hearing of the petition commenced, that this relationship existed, but took no exception to the said Hull's acting, as one of the commissioners, in hearing and deciding the petition, and in surveying and laying out said highway.

The highway, as laid out, necessarily crossed the mouth of an inlet or recess, in the shore of the river Thames, known as " Long Cove," which is a body of water, about one hundred rods in length, three hundred and fifty-five feet in width, at its mouth, and from four to seven feet in depth, and is the outlet of a small stream of water, called " Long Cove Brook," on which there is a saw-mill, about half a mile above the head of said cove. The river Thames being navigable, and an arm of the sea, the tide ebbs and flows in said cove ; the channel of which, from its mouth to points above the location of said highway, is navigable for scows and other vessels of light draught; but toward its head, the depth of water, at high tide, is scarcely sufficient to float a small flat-boat. Said cove is not now navigable for any useful purposes connected with trade or agriculture, except by flat-bottomed boats, the passage of which, up and down the same, would not be materially obstructed by a bridge across the mouth of said cove on the line of said highway. Such bridge, however, would prevent its navigation, by vessels with masts, but would not thereby interrupt commerce, carried on with foreign nations, or between different states, nor would it be an essential obstruction to the navigation of the cove, by the class of vessels generally used upon the same.

The court accepted the report of the commissioners, and established the highway as laid out by them.

The towns of Ledyard and Groton, the original respondents, thereupon brought a writ of error in the superior court, which was reserved for the advice of this court.

*Foster* and *Wait*, for the plaintiffs in error, contended, 1. That, by the common law of England, all arms of the sea, where the tide ebbs and flows, are the property of the sov-

ereign, subject to rights of fishing and navigation, common to all the subjects, under restrictions and regulations, such as the sovereign power shall impose. *East Haven* v. *Hemingway*, 7 Conn. R., 186. *Com.* v. *Charlestown*, 1 Pick., 182. *Charlestown* v. *Middlesex*, 3 Met., 202.

2. That, by the charter of 1662, the king granted all his interest in such navigable waters, and the soil under such waters, with all his right in other lands, in this part of the state, to the colony of Connecticut, with all his powers over the same, subject to the rights of the citizens of this colony, to fish and navigate the same.

3. That any river, creek, cove, &c., where the tide ebbs and flows, and which is capable of being navigated, is an arm of the sea. In this state, it is not necessary, that a stream *should be navigated by boats of any description, or that it should be of any particular width or depth,* to come within the meaning of what our law terms an arm of the sea. If it is a stream where the tide ebbs and flows, capable of sustaining vessels of any description, with their lading, for purposes really useful to trade or agriculture, it is navigable water. 21 Pick., 344. 3 Met., 202.

4. That the legislature of this state, not having, by any general law, delegated to the county commissioners, the power of determining when public convenience and necessity require that navigable streams shall be bridged, that tribunal has no power to authorize any such obstruction to be built; and the proceedings of that body, in laying out a road requiring such a bridge, are void.

5. That no individual corporation or community could obstruct navigable waters, by the erection of a bridge over the same, except by a law of the legislature, authorizing the same to be done. *Com.* v. *Charlestown*, 1 Pick., 182.

6. The county commissioner, who was connected by marriage with, and a brother-in-law of one of the petitioners, was disqualified by such relationship. Stat. 1849, p. 220. The act of 1843 was repealed, in the edition of 1849.

All the county commissioners must act: two can not act in the matter. Stat. 1849, pp. 422–429, 211.

*Lippitt* and *E. Perkins,* for the defendant in error, contended, 1. That the public would not be injured, if the mouth of the cove were closed. The creek above the cove is the place for landing, and will be used, whether there be a bridge or not. There is no error therefore, if the cove is not now navigable, within the meaning of the law upon that subject. The finding of the court shows, that it is not essentially valuable for any purpose connected with trade or agriculture. *Wethersfield* v. *Humphrey,* 20 Conn. R., 227. *Rowe* v. *Granite Bridge Co.,* 21 Pick., 347. *Wadsworth* v. *Smith,* 2 Fair., 278–281. *Commonwealth* v. *Charlestown,* 1 Pick., 180. If the cove be not navigable, within the principle of these cases, the commissioners could lay out a road across it. 3 Met., 202.

2. The road is beneficial and not injurious to the public, and is therefore no nuisance. 5 U. S. Dig., 462. *Pilcher* v. *Hart,* 1 Hump., 524.

3. The fact that Hull is related, as brother by marriage, to one of the petitioners, will not disqualify him, unless it be shown, that the petitioner had some private or special interest in the highway. *Inhabitants of Wilbraham* v. *County Commissioners of Hampden,* 11 Pick., 322. Even if such relationship be a disqualification, in the present case, it was waived. *Quinebaug Bank* v. *Leavens and another,* 20 Conn. R., 87. *Crone* v. *Daniels, id.,* 331. *Selleck* v. *Sug. Hol. Turnp.* Co., 13 Conn. R., 453. *Halleck* v. *Inhabitants of Franklin Co.,* 2 Metc., 558. *Inhabitants of Ipswich* v. *County Commissioners of Essex,* 10 Pick., 519.

ELLSWORTH, J. This is a writ of error, reserved for advice. The error complained of, is, that the county court accepted the report of county commissioners, laying out a highway, which passes through a cove or creek, setting in

from the river Thames, where, at all times, the tide ebbs and flows. The plaintiffs insist, that this portion of the highway will interrupt commerce, and is contrary to the constitution of the United States, and acts of Congress, whose power is supreme, in regulating commerce in this creek. The plaintiffs further insist, that a highway has not been authorized, by the legislature of this state, through the cove, which, they say, is the least which can be required.

These objections, if true, are of the gravest character, and entirely decisive of the merits of the case. But we think, they are not true.

It is a familiar principle, that that commerce, which is rightfully regulated and protected by the acts of Congress, can not be essentially interrupted, even with the license of a state legislature. But it is an equally familiar principle, that not everything which relates to commerce, is a regulation of it; much less to foreign commerce, and that between the states, which is the only commerce to be regulated by Congress; such as the deepening of rivers, making canals, railroads, turnpikes and the like. Nor is every charter which is designed to facilitate commercial intercourse on land or water, where a reasonable toll is allowed, for the expenditures incurred, a regulation of commerce.

Were it necessary, we should doubtless hold, that the commercial powers, originally vested in the states of the Union, so far, certainly, as relates to commerce within the limits of the states, remain unimpaired, except so far as the acts of Congress conflict with state laws. Here, however, there has been no regulation of Congress whatever; at the most, it could be claimed to be only an obstruction to it. But on the facts found, it is not an obstruction, and especially, to the commerce which may be regulated by Congress. So that it comes to be a case, where the state may act, according to its own views of expediency and propriety.

The question, where we are to draw the line between what is a regulation of foreign commerce, and commerce

between the states, and a regulation of commerce *within* the states, has been repeatedly before the court of the United States, and has been decided, as we believe, in conformity with the views of this court, as expressed in the case of the *Thames Bank* v. *Lovell*, 18 Conn. R., 500. We especially refer to *Wilson et al.* v. *Blackbird Creek Marsh Company,* 2 Pet., 250, and the more recent case of *Cooley* v. *Board of Wardens of Port of Philadelphia,* 12 How., 300, where the pilot law of Pennsylvania was held to be within the legislative power of the state, although it had a direct bearing upon commerce between the states and with foreign states. The distinctions laid down in the cases, between what is a regulation of commerce for federal purposes, and for local purposes, are, as it seems to us, well taken and unanswerably sustained.

In the case of *Wilson et al.* v. *Blackbird Creek Marsh Company,* 2 Pet., 250, this question came directly before the court. That was a company, incorporated to construct a dam over Blackbird creek, in the state of Delaware, where the tide-ebbed and flowed, in order to drain the marsh, and, by that means, improve the health of the neighborhood. Marshall, C. J., in speaking of the structure of the dam, the drainage of the marshes, and the improvement of the health of the neighborhood, says: "Means calculated to produce the objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved in the states. But the measure, authorized by this act, stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it *comes in conflict with the constitution, or a law of the United States,* is an affair between the government of Delaware and its citizens, of which this court can take no cognizance." And he observes, "If Congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce, the object of which was to

Groton and Ledyard *v.* Hurlburt and others.

control state legislation over those *small navigable creeks* into which the tide flows, &c., we should feel not much difficulty in saying, that a state law, coming in conflict with such act, would be void. But Congress has passed no such act. The repugnance of the law of Delaware to the constitution, is placed entirely on its repugnance to the power to regulate commerce with foreign nations, and among the states; a power which has not been so exercised as to affect the question." Judge McLean, speaking of this case, in giving his opinion, in *Smith* v. *Turner*, and in *Norris* v. *The City of Boston*, 7 How., says: "This creek was admitted to be navigable, but of so *limited an extent*, that it might well be doubted, whether the general regulation of commerce would apply to it." He says: "hundreds of creeks, within the flow of the tide, are similarly situated. In such cases, involving doubts whether the jurisdiction may not be exclusively exercised by the state, it is politic and proper in the judicial power, to follow the action of Congress. Over the navigable waters of a state, Congress can exercise no commercial power, except as regards an intercourse with other states of the Union, or foreign countries. And, doubtless, there are many creeks made navigable by the flowing of the tide, or by the back water from large rivers, which the general phraseology of an act to regulate commerce may not embrace. In all such cases, and many others that may be found to exist, the court could not safely exercise a jurisdiction, not expressly sanctioned by Congress. The construction of this dam was not complained of, as a regulation of commerce, but as an obstruction to it, and the court held, that, as Congress had not assumed to control state legislation over those *small navigable creeks,* into which the tide flows, the judicial power could not do so. The act of the state was an *internal* and *police* power, to guard the health of its citizens. By the erection of the dam, commerce could only be affected consequentially and contingently, as charged. The

state neither assumed nor exercised a commercial power. In the whole case, nothing else is found, than a forbearance to exercise power over a doubtful· object, which should ever characterize the judicial branch of the government.".

The case before us is not materially different from *Wethersfield & Glastenbury* v. *Humphrey et al.*, 20 Conn. R., 218, where we held, that a creek setting back from the Connecticut River, was not navigable water, within.the meaning of the constitution of the United States. If the case now in question is of that character, and we think it is, the argument of the plaintiffs' counsel is arrested *in limine.* There is no national commerce to be regulated or impeded, and the supposed nuisance will produce no essential injury.

Quite too much importance has been given to the supposed commercial character of this cove. It is time the public should understand, that not every ditch, in which the tide ebbs and flows, through the extensive salt marshes along the coast, and which serve to admit and drain off the salt water from the marshes, can be considered a navigable stream. Nor is every small creek, in which a fishing skiff or gunning canoe can be made to float, deemed navigable ; but in order to have this character, it must be navigable for some general purpose, useful to trade or business.

The county court find, " that the said cove is not now navigable for any useful purpose, connected with trade or agriculture, excepting perhaps by scows or other flat-bottomed vessels ; and that the passage of such vessels up and down said cove, from and to the river Thames, would not be materially obstructed or affected, by a bridge, placed across the mouth of said cove, on the line of said highway." The court does find, that " a bridge across said cove, at or near its mouth, would prevent the navigation of said cove, by vessels with masts, but would not thereby interrupt commerce carried on with foreign nations, or between this state and any of the United States ; nor would said bridge be an

essential obstruction to the navigation of said cove, by that class of vessels which has generally been used for the purpose of taking wood and timber from said cove, and landing sea-weed upon its shores."

Upon these facts, we are satisfied, that no useful commerce of the country will be obstructed, if there shall be, as there doubtless will be, a suitable bridge placed in the structure of the road. There can be no objection, unless it is unlawful, of course, for commissioners, under the general statute, to lay out a highway through a creek in *any* degree navigable, or in which the tide regularly ebbs and flows; which is the second point made.

Any such doctrine would prevent selectmen, or county commissioners, from building causeways and bridges through or over salt marshes and creeks, wherever there is water enough to float a scow, or a canoe, or from wharfing out into deeper navigable waters, to the great advantage of commerce. The common law of this state is certainly otherwise.

We attach no particular importance to the fact, that the bed of such a flow of water is not private property; for, whether it be public or private, such waters are natural highways for the people, and in them, if public, all may fish at their pleasure; and, beyond the preservation of these rights, there is no necessity or propriety in interfering with private enterprises, or public improvements. Hundreds of instances of the kind exist along our sea-board, showing what has ever been understood to be our law. Were it otherwise, it would follow, that the numerous roads and bridges over private but navigable waters of the state, or over the inlets and coves and marshes along the sea-shore from Greenwich to Stonington, or wharves extending into deep water, would become public nuisances, to be destroyed by any one, with impunity, although they might be of the greatest benefit to the commercial intercourse of the people. These views are fully sustained in the first Sw. Dig., 109; *East Haven*

Groton and Ledyard *v.* Hurlburt and others.

v. *Hemingway,* 7 Conn. R., 203 ; *Nichols* v. *Lewis,* 15 Conn. R., 137 ; *Wethersfield & Glastenbury* v. *Humphrey et al.,* 20 Conn. R., 222 ; and many other cases of like import.

We are aware, it has been held, in several cases in Massachusetts, that, where a river, inlet or cove is an arm of the sea, capable of being navigated, for valuable commerce, county commissioners, (whose duty there it is to lay out necessary highways,) are not authorized by the statute law, to license the building of bridges over, or of highways through, or across them. The reason assigned is, that the river, inlet or cove, being already a highway, can not be destroyed or injured, by the making of another highway, by said commissioners. Those cases hold, that special authority must be obtained from the legislature. This reasoning we do not fully appreciate, or more properly, we are not possessed of adequate information to decide upon. We know not what is the peculiar language of their statute,—what powers are delegated to commissioners, and what are reserved to the legislature. Besides, the construction put upon a statute of that state, though it be on the same general subject, gives us but little aid, in construing a statute of our own. Nor are we satisfied, that this limitation has not its origin in their ancient colonial laws, or in some peculiar usage. Indeed, something of this kind is inferable from the fact, that in *Commonwealth* v. *Charlestown,* 1 Pick., 180, Parker, C. J., in giving the opinion of the court, says : " Among the earliest acts of legislation, was an exercise of sovereignty, with respect to the shore or flats of coves, creeks &c., which abounded all over the sea-coast. By the common law, it has been seen, that he, to whom a house-lot was granted, bounded upon the sea, would be the proprietor, only so far as high-water-mark. The desire and necessity of wharves, quays or piers was soon felt by individuals and the community, and the occupation of flats became indispensable. The government, then, to encourage these objects and prevent disputes and litigations, transferred its property

in the shore of all creeks, coves and other places upon the salt water, where the sea ebbs and flows, giving the proprietor of the land adjoining, the property of the soil, to low-water-mark, where the sea does not ebb above one hundred rods. This was a grant of so much of the shore as would be contained within the exterior lines of the upland lot, extended from high-water-mark to low-water-mark, provided it did not extend more than one hundred rods. Ancient Charters, &c., 148."

But, whatever may be the law of their courts, in a case where there is, according to their views, a material and valuable commerce to be preserved, (and which we, think, they would not hold of the commerce in this cove,) we must decide this case for ourselves, according to our own view of the facts and the interpretation of our own laws. And we hold, that there is not, in this instance, any navigation which will be seriously obstructed, and certainly none which will not be secured by a suitable bridge. We have no doubts, that under our statute, county commissioners are fully authorized to lay out highways, with necessary bridges, and to discontinue them, whenever they become useless, and in doing this, if necessary, may pass over existing highways, whether they be coves, creeks, marshes or highways already existing. Certainly the legislature have this power, and they have, for the best of reasons, delegated it to the commissioners, who are but agents of the public law, a standing committee of the legislature, to make personal observation and careful inquiry, and to see that necessary roads are established, and unnecessary ones discontinued.

Another question is made, whether one of the two commissioners, who surveyed and laid out the road, was not disqualified; and if so, then it is said, there was but one commissioner who approved of the highway; which is not enough. Undoubtedly two of three commissioners can survey and lay out a highway, if all have had due notice to be present, this being the rule in relation to public agents.

Here all had notice, and the question therefore is, was Mr. Hull disqualified? If he was, the highway was not legally laid out, and the report should not have been accepted.

Hull, it is said, was disqualified, because he was a brother-in-law of William Browning, one of the petitioners. It will be observed, the objection is altogether *personal*, and not that he was not a commissioner, duly appointed and qualified generally, or in this case, if it was not for this objection.

We do not stop to inquire, whether Browning was a litigant party, so that, by reason of relationship, he was within the statute of judicial disqualification. The plaintiffs insist that he was not, for he had only united with others, to ask that a certain *public duty* might be performed, and therefore, bore the character more of an agent of the public, than of a party in a civil action. See, on this subject, *Wilbraham* v. *County Commissioners*, 11 Pick., 322. And they say as to any interests in costs, these were contingent and hypothetical. But, we pass over these things, because we are satisfied, that, on two grounds, the objection can not be sustained. First, because the commissioner was not a judge; and secondly, if he was, the objection was one which could be waived and actually was waived.

We hold that these commissioners are not judges, within the statute relating to " *Courts,*" but are rather to be held to be a legislative committee, taking the place of committees, formerly appointed upon each application for a new highway, whose business it is, to report facts to the court for judicial action, rather than to act judicially themselves. They are nowhere called judges, and they perform very few duties which partake of a judicial character. Their duties, as prescribed by statute, are to take care of the property of the county, to sell and purchase property for the county, to license persons to keep the jail, to remove deputy sheriffs, to recover possession of the lands of the county, by summary process, to attend to laying and collecting county taxes, to

report to the county court when new highways are neces-
sary and old ones unnecessary, to administer oaths to poor
debtors, to act with commissioners on turnpike roads, in
changing the location of toll gates, to direct the sale of
personal property under attachment, to sit with a justice of
the peace, in cases of forcible entry and detainer, and, in
certain cases, to order the giving of notice.　With one
exception, these duties are administrative, and not judicial;
and that exception is, sitting with a justice of the peace, in
cases of forcible entry and detainer.　And, excepting this,
they never proceed as a *court,* trying *civil causes.*　There are
no litigant parties before them, no fixed rules of procedure
or evidence, no bills of exception, or judgments which can
be reviewed by writ of error, or *certiorari.*　In the case of
*Wethersfield & Glastenbury* v. *Humphrey et al.,* we held, that
they were not confined to any certain evidence and modes
of trial, but might hear the parties themselves, and every-
body else, and receive any satisfactory evidence, or act from
their own knowledge and observation.　We see not how
these commissioners essentially differ from commissioners
on bridges, ferries, sewers, or turnpike roads, or fence view-
ers or committees of courts, or selectmen; and these are
certainly not *judges,* though they are required to exercise
sound judgment.　Would any individual, in any of the fore-
going classes, be absolutely disqualified from acting, because
of a relationship to a person who might be affected by the
decision, as for instance, a commissioner on turnpike roads?
Hence we say, these county commissioners, in this act, were
not *judges,* but administrative agents of the legislature.

It is said that, in the cases of *Stoddard* v. *Moultrop,* 9
Conn. R., 502, and *English* v. *Smith,* 13 Conn. R., 225, we
have decided, that commissioners on insolvent estates exer-
cise a judicial power and are within the *spirit* of the act of
judicial disqualification of judges; and it was therefore held,
that one of the commissioners was not a *disinterested* and
*judicious* person.　The reasons for this application of the

statute were given at length, by the chief justice, where he
dwelt upon the features of the case, which distinguish and
characterize the power of the commissioner, as possessing a
judicial character.   We are not disposed, nor have we oc-
casion, to call in question the conclusion to which the court
came in those cases, because we are satisfied, if commission-
er Hull was disqualified, within the *spirit* of the act, the
obligation could be waived, otherwise than by a writing, as
it can be, in the case of a juror or auditor ; though, in the
case of commissioners on insolvent estates, the objection
can not perhaps be waived, not because of its nature or the
language of the statute, but because of the *situation of the
case*, there being so many parties, as creditors, heirs and dev-
isees : this is the reason why we would not disturb those
decisions.   There was no waiver, and probably could be
none, within the statute.

   But if it be true, that commissioners, in laying out a high-
way, and other commissioners above alluded to, in discharg-
ing their public duties, exercise powers of a judicial charac-
ter, the reason above mentioned, viz., that there can be a
waiver in most cases, is a perfect answer to the objection in
this case.   The argument is this : the commissioner is a
judge, and therefore, by the statute 1849, p. 220, was dis-
qualified, and so could not act in that character, as *there was*
*no written waiver.*   This is quite a *non sequitur*, even if the
first part of the proposition be admitted to be true.   The
statute, in every section of it, relates to *courts.*   The *title*
of the act is, " Of certain general provisions respecting
courts."   The first section provides how *judges* of the *su-*
*preme court*, of the *county courts*, of *probate courts* and *jus-*
*tices of the peace*, shall be appointed.   The second section
provides at what time those who are annually elected shall
cease to act; and the third section provides that they shall not
hold the office of sheriff, deputy sheriff, or constable.   Thus
far, none but the *judges* of these *courts* and *justices* of the
peace are spoken of,—certainly not commissioners on bridg-

Groton and Ledyard *v.* Hurlburt and others.

es, on ferries, on sewers or turnpike roads, or selectmen, or committees of courts, or fence viewers, or auditors, or jurors, or appraisers of land on execution, or arbitrators, or county commissioners. None of them constitute a court, and none of them are judges, in common parlance. To hold other-wise, and apply to them or their acts the judicial disqualifi-cation mentioned in the next section of the statute, would produce great confusion and alarm. Suppose one of them to be a sheriff, or a sheriff's deputy, or a constable: then he would forfeit his office; for, by the third section already recited, a *judge* can not hold these executive offices. We come next to the fourth section of, the act, and here the lan-guage is clear and precise. "Wherever there shall be so near a relationship between any *judge* or *justice* of the peace, and any party in a *civil action,* &c." Who can mistake the person pointed out, and the occasion, and the place? It is a *court.* And then, at the close of this section we find, " In all such *actions* the *said judge* or *justice* shall be dis-qualified to act as judge, or render judgment."

We do not deny, that the statute, in the fourth section, does incapacitate these judges and trustees, unless the objection is waived in writing; but we suppose this specific kind of waiver applies only to the judges and justices sitting in court. In *court,* the statute directs that the writing shall be *executed* and preserved. Here is the important point, allowing that this fourth section is, in spirit, to be applied to all the classes of persons herein before enumerated. The written waiver is not the exclusive mode and means of waiver. It may be, in courts, where *civil actions* are tried and determined; but when we come to the various classes of public agents, to whom the spirit of the law is only applied, it is impossible to have a written waiver, and none such was intended. Who are the parties to sign such a writing, in settling an in-solvent estate? But, to put an end to the question, we have decided that a written waiver is not essential. In the case

of *Quinebaug Bank* v. *Leavens*, 20 Conn. R., 87, we decided, that an objection to a juror, on the ground of relationship, (and he is within the spirit of the statute,) did not require a written waiver; and the same in the case of *Crone* v. *Daniels*, same volume, p. 331, and the like in *Selleck* v. *Sugar Hollow Turnpike Co.*, 13 Conn. R., 453, as to auditors. In all these cases, it was decided, that there could be a waiver by matter *in pais*. The same doctrine is held in *Hallock* v. *County of Franklin*, 2 Met., 559, as to a county commissioner; *Howland* v. *Gifford*, 1 Pick., 43, note; *Merrill* v. *Inhabitants of Berkshire*, 11 Pick., 269; and *Fox* v. *Hazleton*, 10 Pick., 275. And we should now perhaps hold that there might be a waiver of a *personal* objection, by estoppel at least, in case of an appraiser of land on execution, notwithstanding the case of *Tweedy* v. *Picket*, 1 Day, 109, where one of the freeholders, a relative of the creditor, was appointed, by the justice, without the consent or knowledge of the debtor, and where, of course, the question of waiver of a mere *personal* objection did not arise. The same is true of *Fox* v. *Hills*, 1 Conn. R., 295, which was a similar case. Nor did any question of waiver arise in the before cited cases of *Stoddard* v. *Moulthrop* and *English* v. *Smith.* Nor do we know of any cases where the question has arisen, unless it be *Mitchell* v. *Kirtland*, 7 Conn. R., 229, where it *might* have been, but was not raised; for it is there found, after each of the parties had appointed an appraiser, that the third appraiser, who was appointed by the agreement and concurrent act of both parties, was the tenant of the debtor in the execution. The claim of waiver was not made on the trial, and had it been, on principle, certainly it should not have prevailed; and if a similar case should arise again, we trust it would not, under the more liberal exposition of the law in subsequent cases. This decision, too, was only following up *Chapman* v. *Griffin*, 1 Root, 196; and there the question was not made. It appears that three appraisers were agreed upon by the parties, all of whom were *qualified*, except that one

of them did not live within the limits of the town.   The court allowed the debtor, after the land was set off to him, to go back and object to the title on that ground.   This may be law, but it does not accord with our sense of justice and propriety.   It is not good sense, at all events, nor in harmony with more modern decisions : the debtor should have been estopped.   See *Cowles* v. *Bacon,* decided on the present circuit.   *Brown* v. *Wheeler,* 17 Conn. R., 346.   *Roe* v. *Jerome,* 18 Conn. R., 138.   *Bushnell* v. *Church,* 15 Conn. R., 419.   *Whitaker* v. *Williams,* 20 Conn. R., 98, 101, 527. *Pickard* v. *Sears et al.,* 33 English Common Law Reports, 115. *Gosling* v. *Birnie,* 20 *id.,* 153.   *Heane* v. *Rogers et al.,* 17 *id.,* 449.   *Gregg* v. *Wells,* 37 *id.,* 54.   *Welland Canal* v. *Hathaway,* 8 Wend., 480.   *Davidson* v. *Franklin,* 20 English Common Law R., 363.   *East Haddam Bank* v. *Shailor,* 20 Conn. R., 18.

At this day, few men would be bold enough to contend, that a litigant party in a court of justice, would receive favor, who, having knowledge of a *personal* objection to a juror, auditor, committee-man, or commissioner, does not take exception on that ground, but prefers to take the chance of a favorable result, and, when disappointed, goes back and sets up the objection, even though it be a relationship to himself.   In *Tweedy* v. *Picket* and *Fox* v. *Hills,* and *Stoddard* v. *Moulthrop,* there had been no opportunity to waive the objections ; which in our view, is quite material.

In the language of Shaw, Ch. J.: "A party litigant, knowing of matter of personal exception to a juror, lies by, taking his chance of a favorable verdict : if, when that verdict is against him, he could go back and take the exception, it would work great injustice.   By consenting to go on, with a knowledge of the exception, he consents to abide the result, either favorable or unfavorable."   The same remarks are made, in relation to a commissioner, in 10 Pick., 519.

We need not remark, that relationship is no legal disqualification to a judge, at common law; and that, if, in this case,

the disabling clause of the statute does not extend to this commissioner, or if it does, and the mode of waiving the objection is not exclusively that pointed out in the statute, he was competent to act, and the proceedings were entirely regular.

It will be observed, we have said nothing of the evidence of the waiver in fact; we have thought it too clear to require any comments.

We advise that there is no error.

In this opinion, the other judges concurred.

Judgment affirmed.