711 So.2d 57 (1998)
Robert V. LEE, III, and Mirte Deboer Lee, etc., Appellants,
v.
Robert L. WILLIAMS and Lillian D. Williams, etc., Appellees.
No. 96-2560.
District Court of Appeal of Florida, Fifth District.
March 30, 1998.
Arnold H. Slott of Slott & Barker, Jacksonville, for Appellants.
B. Thomas Whitefield of Morford & Whitefield, P.A., Jacksonville, for Appellees.
Michael L. Rosen, Executive Director, Tallahassee, Amicus Curiae, for Florida Legal Foundation, Inc.
F. Perry Odom and Suzanne B. Brantley, Tallahassee, Amicus Curiae, for the State of Florida Board of Trustees of the Internal Improvement Trust Fund.
GRIFFIN, Chief Judge.
It is a compelling feature of our legal system that often far-reaching legal questions do not come to the courts for resolution until two or more ordinary citizens who have become antagonists require its resolution. This is such a case. The parties to this case are neighbors and their dispute is over the appellants' right to construct a boatlift. It appears that resolution of the dispute requires us to reconsider who owns the nonnavigable tidelands of Florida.
The basic facts that are not in dispute appear as follows in the final judgment of the lower court:
Plaintiffs, Robert V. Lee, III, and Mirte Deboer Lee, Husband and Wife, are the owners of property described as Lot 12 of Butler's Replat of Butler's Subdivision, according to the plat thereof recorded in Plat Book 7, page 15 of the public records of St. Johns County, Florida. Defendants, Robert L. Williams and Lillian D. Williams, Husband and Wife, own Lot 13 (except the SE 140 feet thereof). The Lees' and Williams' lots are contiguous. The westerly boundary of the Williams' lot is defined as the centerline of Butler's Branch, a small waterway shown on the plat of Butler's Replat. Lees' northern boundary is Julington Creek, a navigable body of water. *58 The waters of Butler's Branch and Julington Creek join at the northwest end of the Lees' property.
Fred Ward was the owner of Lot 13 in 1960 when he entered into an agreement with Fred G. Hafers, owner of lands abutting the western and northern boundaries of Lot 13. The agreement permitted Ward to excavate a navigational canal or ditch to run northerly through and across Lot 13 from the northerly right-of-way line of Wentworth Avenue, through and across the conflux of Butler's Branch and Julington Creek and into Julington Creek. The owner of Lot 13 was granted a perpetual easement and right-of-way over and upon the canal.
In 1961 when Ward sold the northerly portion of Lot 13 to the Williams, the canal had been excavated. Initially the canal bank was further from the common boundary of Lots 12 and 13 than it is today. Mr. Williams testified that in 1961 had the Lees' boatlift been erected where it is today, it would have been on dry land. Over the years as a result of boat wakes, and the action of the elements the canal bank eroded toward the common boundary line.
In the mid-1980's the then owner of Lot 12, without the Williams' permission, constructed a bulkhead along the then existing bank of the canal that was near the common boundary. The surveys in evidence show the greater portion of the bulkhead protecting Lot 12 was built on Lot 13. At one point, the bulkhead encroaches five (5) feet over the common boundary onto Lot 13. Mr. Williams testified he thanked the owner for bulkheading part of Williams' property and that he and the owner of Lot 12 never had any dispute as to the ownership of the property where the bulkhead was located.
The Lees purchased Lot 12 in 1993. Sometime in October of 1994, the Lees without the permission or knowledge of the Williams, caused a boatlift to be constructed in the canal adjoining the previously constructed bulkhead. The boatlift is located entirely within Lot 13. According to Mr. Lee's testimony the boatlift was constructed so that it will support a roof. The Williams protested construction of the boatlift, tempers flared, angry words were spoken, this law suit was filed and a temporary injunction obtained against the Williams.

* * *
At issue in this case is whether the canal, which traverses nonnavigable tidelands within the Williams' lot, is privately owned by appellees or whether it is sovereignty land available for public use. Resolving the dispute in favor of the Williams, the trial court concluded that Clement v. Watson, 63 Fla. 109, 58 So. 25 (1912) was dispositive. In Clement, Thomas Watson was sued by Waldo Clement for excluding him from fishing privileges in waters which were affected by the daily ebb and flow of the ocean tides. The disputed property was a cove surrounded by property owned by Watson's wife, except its 300-foot wide mouth which merged with a river. A sandbar traversing the mouth of the cove was almost bare at low tide but was covered at high tide. The cove waters, which had originally been shallow and nonnavigable, had been dredged so that a 16-foot wide channel rendered it accessible by small craft. The Watsons' home was near the cove and their wharf extended from the land into the cove.
The trial court refused Clement's requested jury instruction that Watson was not entitled to private or exclusive ownership or control of waters subject to the daily ebb and flow of the tides. At the conclusion of the trial, the court entered a directed verdict in favor of Watson.
Affirming the trial court, the supreme court noted that the state holds for public use navigable waters and the lands under such waters, including the shore or space between high and low water marks. Defining navigable waters as those waters which "by reason of their size, depth, and other conditions" are navigable for useful public purposes, it emphasized that waters are not navigable merely because they are affected by the tides. The court distinguished between sovereignty and privately-owned lands in the following way:

*59 The shore of navigable waters which the sovereign holds for public uses is the land that borders on navigable waters and lies between ordinary high and ordinary low water mark. This does not include lands that do not immediately border on the navigable waters, and that are covered by water not capable of navigation for useful public purposes, such as mud flats, shallow inlets, and lowlands covered more or less by water permanently or at intervals, where the waters thereon are not in their ordinary state useful for public navigation. Lands not covered by navigable waters and not included in the shore space between ordinary high and low water marks immediately bordering on navigable waters are the subjects of private ownership, at least when the public rights of navigation, etc., are not thereby unlawfully impaired. [citations omitted].
Id., 58 So. at 26-27 (emphasis added). See also City of Tarpon Springs v. Smith, 81 Fla. 479, 88 So. 613 (1921). The Clement court determined that Watson owned the cove, including its attendant fishing privileges.
Based on Clement[1], the court in this case concluded that the dredging of a navigable canal across Butler's Branch, a nonnavigable waterway, did not render the branch navigable for purposes of determining ownership of the canal. The court found further, consistent with Clement, that the branch could not be deemed navigable merely because its waters were tidal and flowed into the navigable waters of Julington Creek. The court acknowledged that sovereign ownership of land is, in some states, based upon whether waters are tidal. The court concluded that the majority of states, including Florida, base the determination on whether the water is navigable. See Art. X, § 11, Fla. Const.;[2] § 253.12(1), Fla. Stat. (1995);[3]Coastal Petroleum Co. v. American Cyanamid Co., 492 So.2d 339, 342 (Fla.1986), cert. denied, 479 U.S. 1065, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987). Clement is clear, it has never been overruled[4] and the facts are analogous to the facts of this case.
Urging that the trial court's reliance on Clement is misplaced, appellants and the State of Florida, through the Board of Trustees of the Internal Improvement Fund ["Trustees"], appearing as amicus curiae, contend the landmark 1988 decision of the United States Supreme Court in Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988), supersedes Clement and compels the conclusion that all of Florida's tidelands, both navigable and nonnavigable, including the land on *60 which the Lees' boatlift is constructed, are sovereignty lands of the state.
In Phillips Petroleum, the issue before the Supreme Court was whether Mississippi, upon its entrance to the union in 1817, took title to lands lying under nonnavigable tidally influenced waters in the Gulf of Mexico. The Supreme Court, citing Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), characterized as its longstanding precedent that the states, upon their entry into the Union, received ownership of all tidelands or lands under waters, including the shore or space between high and low water marks, subject to the daily tidal ebb and flow. At the same time, however, the court reiterated that real property law is for the individual states to develop and administer, that the public trust doctrine is a common law doctrine and that individual states are free to define the limits of lands held in public trust and to recognize private rights in such lands. It explained that some states have chosen to depart from the common law rule limiting crown ownership to the soil under tidal waters. In those states, the public trust interest in tidelands is based on navigability rather than the ebb and flow rule.
The three critical holdings of Phillips Petroleum are these:
1) The states, upon entry into the Union, received ownership of all lands under waters subject to the ebb and flow of the tide.[5]
2) This fact is based on "well-established," "consistent," "long-standing precedents of the court since the early 19th century." It is settled law with a "lengthy history at common law, in this court and in many state courts ..."[6]
3) It is equally well established that the individual states have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit. Phillips Petroleum, 484 U.S. at 475, 108 S.Ct. at 794-95.
The question thus becomes how has Florida defined the limits of lands held in public trust and what private rights in tidelands has Florida seen fit to recognize. The threshold position of the Trustees is that Phillips Petroleum says Florida acquired the nonnavigable tidelands in 1845 when Florida became a state and, since no one can produce a deed of conveyance out of the state or cite any statute expressly abrogating the state's right to these lands, ownership remains in the state. What Phillips Petroleum makes clear, however, and what the Trustees implicitly recognize, is that the public trust doctrine is a creature of the common law, the extent of which and alterations to which are subject to judicial determination, at least where there is no contrary constitutional or legislative directive. 484 U.S. at 475, 108 S.Ct. at 794-95.
This brings us to Justice Whitfield, the author of Clement v. Watson, whose ears must be burning as he sits in that great law library in the sky listening to the attacks on his Clement opinion. Since Phillips Petroleum was decided, at least two law review articles[7] have exhaustively examined Justice Whitfield's opinion in Clement, as well as all his other opinions, in an effort to explain what one of the authors referred to as Whitfield's "delay" in "coming to grips with the subject [of ownership of nonnavigable tidelands] in consonance with the later rule in Phillips Petroleum." See Norwood Gay, Tidelands, in Symposium on Sovereignty Lands, 20 Stet. L. Rev. 143, 147 (1990). These authorities and, particularly, the appellant and the trustees make elaborate efforts to discredit the opinion, suggesting Clement must have been the result of an unexplainable aberration or the product of some terrible slip of the pen of which Justice Whitfield subsequently repented. The central premise of all these analyses, however, appears to be a conviction that Clement would have been decided differently if only Justice Whitfield had had a copy of the Phillips Petroleum opinion.
Justice Whitfield's later writings, most notably his dissent in the case of State ex rel. Buford v. City of Tampa, 88 Fla. 196, 102 So. *61 336 (1924)[8] are cited for the proposition that Justice Whitfield may have changed his mind about nonnavigable tidelands being sovereignty lands. First, it is pure conjecture whether Justice Whitfield believed Clement to have been wrongly decided. Certainly, he never said so.[9] In any event, it is beside the point what one justice on the Clement court may have later concluded. Further, the supposition that Clement was decided out of ignorance of the state's ownership of nonnavigable tidelands pointedly ignores the central pillar of Phillips Petroleumthat conveyance of the nonnavigable tidelands to the states had been the settled, long-established and consistent law of the United States since the early 19th century.[10] Yet, in Clement, *62 the Supreme Court of Florida, which presumably knew the law, relied on decisions from those other states that had settled on navigability, not the ebb and flow of the tides, to define sovereignty land.[11] Indeed, several of the cases relied upon by the Clement court are those identified by the majority in Phillips Petroleum as having departed from the common law rule. Rowe v. Granite Bridge Corp., 38 Mass. 344, 347 (1839); Town of Groton v. Hurlburt, 22 Conn. 178 (1852); Town of Wethersfield v. Humphrey, 20 Conn. 218 (1850). The Massachusetts court in Rowe said:
It is not every ditch, in which the salt water ebbs and flows, through the extensive salt marshes along the coast, and which serve to admit and drain off the salt water from the marshes, which can be considered a navigable stream.
Rowe at 347.
Appellants urge that the supreme court subsequently acknowledged that Florida received title to both navigable waters and all tidelands within the state, citing to dicta.[12] No Florida supreme court case has actually held a nonnavigable tideland to be sovereignty land, however, and Clement has expressly held that they are not.
In decisions, except in dicta, before and after Clement, the Florida supreme court appears to have adhered to the principle that state sovereignty ownership extends only to "lands under tidal navigable waters," Hayes v. Bowman, 91 So.2d 795, 799 (Fla.1957), and "fresh navigable waters." Odom v. Deltona Corp., 341 So.2d 977, 988 (Fla.1976) (emphasis added). That the rule of Clement has prevailed is suggested by the decision in Florida Board of Trustees of the Internal Improvement Trust Fund v. Wakulla Silver Springs Co., 362 So.2d 706 (Fla. 3d DCA 1978), cert. denied, 368 So.2d 1366 (Fla.1979). In that case, the district court affirmed a trial court's determination that since Rock Harbor, a tidally affected inlet of the Atlantic Ocean, is not navigable in its own right, the *63 state's title to the underlying lands did not extend to the mean high water line, as with sovereignty lands, but only to the meander line.
In Florida, waters are not considered navigable merely because they are affected by the rise and fall of the tides ..., and if it is determined that the waters adjacent to a shoreline are not navigable, the State does not hold title to the shoreline below the mean high water line.
362 So.2d at 710. The court also reaffirmed the Clement rule that "the subsequent dredging of a navigable channel across a nonnavigable body of water does not render that body of water navigable." Id. at 711.
Apart from the dicta relied on by appellant, there is scant authority for the proposition that Florida has ever regarded nonnavigable tidelands as sovereignty lands subject to the public trust doctrine simply because they are affected by the tides.[13] Indeed, "sovereignty lands" are defined in the state constitution to mean "lands under navigable waters." Art. X, § 11, Fla. Const.[14] The Trustees' argument that "the mention of `lands under navigable waters' does not necessarily exclude other types of lands as sovereignty lands" is not persuasive.[15] If the constitution had simply declared sovereignty lands to be held in trust, this argument might have weight but the detailed description of sovereignty lands has to be afforded significance. See also § 253.12, Fla. Stat. (1997). The Trustees acknowledge in their brief that this result may have been driven by a public policy favoring development of mud flats in the last century, but that those "conditions" do not exist now.[16] This change in "public policy" from the late 1800's and the first half of this century has been noted by others. Louis B. Guttman, Sovereignty Land ClaimsBalancing Issues and Equities, 20 Stet. L.Rev. 177, 184 (1990). This assertion of the sovereign right to the nonnavigable tidelands of the state comes too late, however.
The courts of other states have found that Phillips Petroleum did not affect existing principles of state law governing the status of nonnavigable tidelands or authorize a modification of established property rights based on a "revisionist view of history." Bell v. Town of Wells, 557 A.2d 168, 172-73 (Me. 1989). See also State ex rel. Meek v. Hays, 246 Kan. 99, 785 P.2d 1356, 1363-64 (1990) (Phillips Petroleum did not alter state law regarding public rights in nonnavigable waters and did not authorize states to extend the public trust doctrine to nonnavigable waters); Delacroix Corp. v. Jones-O'Brien, Inc., 597 So.2d 65, 70 (La.Ct.App.), cert. denied, 604 So.2d 1303 (La.1992) (Phillips Petroleum should not be construed to upset titles long established under state law); Rettkowski v. Department of Ecology, 122 Wash.2d 219, 858 P.2d 232 (1993) (rejecting dissenter's view, id. at 243, 858 P.2d at 245, that the public trust could be extended to nonnavigable waters based on Phillips Petroleum). The Louisiana legislature requested the Louisiana State Law Institute to make a study of this issue under Louisiana law. The conclusion reached was that Louisiana did not become reinvested with ownership of nonnavigable tidelands conveyed under previously existing state law. Lawrence E. Donohoe, Jr., Patrick G. Tracy, Jr., Phillips Petroleum Co. v. Mississippi: The Louisiana State Law Institute Advisory Opinion *64 Relative to Non-Navigable Waterbottoms, 53 La. Law Rev. 35 (Sept.1992).
Appellants finally challenge the trial court's finding that the evidence was insufficient to conclude that the subject property in this case is below the mean high water mark and within the margin of Julington Creek, a navigable waterway. We agree with the lower court's conclusion.
AFFIRMED.
W. SHARP and PETERSON, JJ., concur.
NOTES
[1] Clement was not decided in a vacuum, however. Three prior decisions of the high court had clearly indicated the view that nonnavigable tidelands were not sovereignty land. State v. Black River Phosphate Co., 32 Fla. 82, 13 So. 640 (1893); State ex rel Ellis v. Gerbing, 56 Fla. 603, 47 So. 353 (1908); Broward v. Mabry, 58 Fla. 398, 50 So. 826 (1909).
[2] SECTION 11. Sovereignty lands.The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when not contrary to the public interest.
[3] 253.12 Title to tidal lands vested in state.

(1) Except submerged lands heretofore conveyed by deed or statute, the title to all sovereignty tidal and submerged bottom lands, including all islands, sandbars, shallow banks, and small islands made by the process of dredging any channel by the United States Government and similar or other islands, sandbars, and shallow banks located in the navigable waters, and including all coastal and intracoastal waters of the state and all submerged lands owned by the state by right of its sovereignty in navigable freshwater lakes, rivers, and streams, is vested in the Board of Trustees of the Internal Improvement Trust Fund....
[4] One author has suggested that Clement was overruled by Thiesen v. Gulf, Florida & Alabama Ry., 75 Fla. 28, 78 So. 491 (1917). Roseanne Gervasi Capeless, History of Florida Water Law: Tracing the Ebb and Flow of Florida's Public Trust Doctrine Through the Opinions of Justice James B. Whitfield, 9 J. Land Use & Envtl. L. 131, 155 (1994). This conclusion cannot fairly be sustained. Thiesen did not involve nonnavigable tidelands and Clement was not mentioned. "For one case to have the effect of overruling another, the same questions must be involved; they must be affected by a like state of facts and a conclusion must be reached in hopeless conflict with that in the former case." State ex rel. Garland v. City of West Palm Beach, 141 Fla. 244, 248, 193 So. 297, 298 (Fla.), appeal dismissed, 309 U.S. 639, 60 S.Ct. 893, 84 L.Ed. 994 (1940).
[5] 484 U.S. at 481, 108 S.Ct. at 798.
[6] 484 U.S. at 479, 108 S.Ct. at 797.
[7] Norwood Gay, Tidelands, in Symposium on Sovereignty Lands, 20 Stet. L. Rev. 143 (1990); Capeless, 9 J. Land Use & Envtl. L. 131 (1994).
[8] Interestingly, in the transcript of the record contained in the court file in this case appears the following recitation of the state's sovereignty rights:

The State of Florida, by and through Rivers H. Buford, as Attorney General of the State of Florida, and Rivers H. Buford, as Attorney General of the State of Florida [sic], bring this their bill of complaint against the City of Tampa, a municipal corporation, and D.P. Davis, a citizen and resident of Dade County, Florida, and thereupon your orators complain and say:
First. That the State of Florida on its admission as a State of the United States of America, became seized and possessed in its sovereign capacity of all and singular the lands within the boundaries of the said State covered by navigable waters at high tide, subject, however, to the governmental trust upon which such lands are held for the benefit of all of the people of the State, and the greater portion of the premises hereinafter described constitute a part of such lands covered by navigable waters at high tide, and became the property of the State of Florida on its admission as a State, subject to the governmental trust aforesaid.
Transcript of record at 1,2, State ex rel. Buford v. City of Tampa, 88 Fla. 196, 102 So. 336 (1924).
[9] Justice Whitfield authored Helpful and Useful Matter published in Volume III of the 1941 compilation of Florida Statutes. He described sovereignty lands as follows: "When Florida was admitted as a state, March 3, 1845, the state by virtue of its sovereignty, became the owner for the benefit of its inhabitants of all lands under bodies of navigable water and tide lands within its territorial limits." Whitfield's Notes, vol. III, pt. II, Fla. Stat. (1941), at 235. Does this mean the land under navigable waters and the tidelands of those waters or does this mean all land affected by the ebb and flow of the tides even if they do not border navigable waters? Recall that Justice Whitfield said in Clement:

Lands not covered by navigable waters and not included in the shore space between ordinary high and low water marks immediately bordering on navigable waters are the subjects of private ownership, at least when the public rights of navigation, etc., are not thereby unlawfully impaired.
Clement v. Watson, 63 Fla. 109, 58 So. 25. Otherwise stated, lands covered by navigable waters and lands included in the shore space between ordinary high and low water marks immediately bordering on navigable waters are not capable of private ownershipin other words, they are sovereignty lands.
[10] Review of the briefs submitted in the Clement case shows that the issue was squarely presented. In Clement's brief at pages 3 and 4, the following argument appears:

It is admitted by appellee that New River and New River Sound are navigable waters and that the cove on which the Watson house is situated is a bight or pocket subject to ebb and flow of tides opening into these navigable waters to a width of three hundred feet. The wlole [sic] contention seems to be that private ownership extends over tidal waters within the jaws of the land, at least, where the body of the water in question is of such dimensions as in the instant case, but we find nothing in any decision of this court which lends weight to this contention. The record shows that the cove in question was at all times navigable for small craft, at least at high tide. We admit that the doctrine of navigability might be pressed to an extreme degree and that the tide might get into place [sic] where it would be unreasonable to hold that the public rights would follow it, but we think the Court would judicially know that the fisheries in partially enclosed waters is often valuable to the public. [sic] and that to deprive the public of it would be greatly to deminish [sic] both in extent and value the great open fisheries of this state, which form so great a part of its resources.
Brief for Appellant at 3, 4, Clement v. Watson, 63 Fla. 109, 58 So. 25 (1912). Watson, on the other hand, urged at pages 8-9:
In dealing with the tidal test, we have this to consider: Beyond the cove lies New River Sound, and into the Sound enters the New River. Both the waters of the cove and of the river mingle with the waters of the sound. The waters of the sound outside mingle with the waters of the Atlantic. Here are three distinct and separate bodies of water: the river, the ocean, the sound, and a fourth, the cove. Speaking exactly, the river, the sound, the cove have no tide. The tide comes from the ocean outside. In a low flat country such as that in the location of Watson's property, the tide might be perceptible for miles up into the inland, up into all the little creeks, ditches and canals, and other portions of water that flow into the main bodies. It would be absurd to hold that all of these small water formations would be navigable simply because the tide ebbed and flowed in them. I take it this Court never intended to say anything of that kind. Of course, the shore line is affected by the tide, but where one body of water passes into another, the shore line is broken. Where the Atlantic ocean meets the waters of New River Sound, the shore line of the ocean is broken; where the shore line of the Sound begins. The shore line of the Sound is broken where the shore line of the New River begins; so is the shore line of the Sound broken where Watson's cove begins. Watson's cove is as distinct from the Sound as the Sound is from the ocean, of [sic] the river. Just as the Sound has a bar where it enters the waters of the ocean; just as the River has a bar where it enters the waters of the Sound, so we find a bar where the waters of the cove meet the waters of the Sound. The language of the decisions by this Court is that lands that are covered and uncovered by the ordinary daily tides of public navigable waters are shore or tide lands. New River Sound is public navigable water and its tide affects the lands lying along its shore line; and where that tide is said to affect the land under the cove it has gone beyond its shore line. In this sense the Sound has a tide. In this same sense the cove has a tide, but the difference herein is this that the one is navigable in fact and the other is not.
Brief for Appellee at 8, 9, Clement v. Watson, 63 Fla. 109, 58 So. 25 (1912).
[11] In tidal waters, however, navigability for title purposes appears to be not always based on navigability-in-fact. In some states, public ownership appears to extend to submerged lands subject to the ebb and flow of the tide, regardless of actual navigability. An excellent in depth article on this subject indicates that in Louisiana, Maryland, Mississippi, New Jersey, New York, and Texas, state ownership extends to all waters subject to tidal ebb and flow; while in California, Connecticut, Florida, North Carolina, and Washington, public ownership is based on navigability-in-fact.

George M. Cole, Tidal Water Boundaries, 20 Stet. L.Rev. 165, 168 (1990) (footnote omitted).
[12] Martin v. Busch, 93 Fla. 535, 112 So. 274, 283 (1927) (upon its entrance into the union in 1845, Florida, "by virtue of its sovereignty, became the owner of all lands under the navigable waters within the state, ... and also all tidelands, viz. lands covered and uncovered by the daily ebb and flow of normal tides"); Apalachicola Land & Dev. Co. v. McRae, 86 Fla. 393, 98 So. 505, 520 (1923), dismissed, 269 U.S. 531, 46 S.Ct. 22, 70 L.Ed. 397 (1925) ("land grants to private ownership do not include lands under navigable waters or tidelands, unless such an intent clearly appears from acts of competent authority to pass title to such lands"). Because these and other cases relied on by the appellants and to the trustees involved navigable waters, the intent of these statements is unclear. Certainly, many of these cases suggest that what the court referred to was the land submerged below navigable waters (i.e., the "floor" or the "bed") as well as those lands covered and uncovered by the rise and fall of the tides of the navigable waters.
[13] Clement and its progeny hold (a) "that tidelands which neither immediately border the sea nor comprise the shores of the sea ... are the subject of private ownership unless they are themselves navigable"; and (b) although Phillips Petroleum "held that such lands passed to the states by operation of law under the equal footing doctrine, ... [t]he Florida cases ... indicate that Florida abandoned such lands in the early part of this century." D. Guest, The Ordinary High Water Boundary on Freshwater Lakes and Streams: Origin, Theory and Constitutional Restrictions, 6 J. Land Use & Envtl. L. 205, 229-30 n.104 (1991) (emphasis added).
[14] "Sovereignty lands.The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people."
[15] Brief of Trustees at 11.
[16] Brief of Trustees at 28.