# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D2023-0064
LT Case No. 16-2017-CA-004945

_____

KATHLEEN JENNINGS, THE
ATTORNEY GENERAL OF THE
STATE OF DELAWARE,

    Appellant,

    v.

HUGH M. DURDEN, JOHN S.
LORD, THOMAS G. KUNTZ, TERRI
KELLY, GEOFFREY M. ROGERS,
and WINIFRED L. THORNTON, as
Trustees under the Last Will
and Testament and Codicils
thereto of Alfred I. duPont,
deceased; THE NEMOURS
FOUNDATION, a not-for-profit
corporation organized under the
laws of Florida; and ASHLEY B.
MOODY, ATTORNEY GENERAL OF
THE STATE OF FLORIDA,

    Appellees.

_____

On appeal from the Circuit Court for Duval County.
Marianne L. Aho, Judge.

Kristen M. Fiore, of Akerman LLP, Tallahassee, Amy M. Leitch,
of Akerman LLP, Jacksonville, Gerald B. Cope, Jr., of Akerman
LLP, Miami, Garrett B. Moritz and Elizabeth M. Taylor, of Ross

Aronstam & Moritz LLP, Wilmington, DE, and Christian Douglas Wright, Deputy Attorney General of Delaware, Wilmington, DE, for Appellant.

Daniel K. Bean, Jackie Van Laningham, and Stacy A. Scaldo, of Abel Bean Law, PA, Jacksonville, and James A. McKee and Heather A. Lee, of Foley & Lardner LLP, Tallahassee, for Appellees Trustees.

Jonathan Y. Ellis and Mark E. Anderson, of McGuire Woods LLP, Raleigh, NC, and R. Eric Bilik and Kimberly T. Mydock, of McGuire Woods LLP, Jacksonville, for Appellee, Nemours Foundation.

Ashley Moody, Attorney General, and William H. Stafford, III, Special Counsel for Office of Attorney General, Tallahassee, for Appellee, Attorney General.

May 31, 2024

PER CURIAM.

This appeal is one in a series among the same parties regarding the administration of and payments from a charitable trust.[1] We hold that the trial court erred in finding that Appellant, the Delaware Attorney General ("DAG"), lacked standing and we further hold that the trial court erred in dismissing the DAG's breach of contract claim against Appellees, Hugh M. Durden, John S. Lord, Thomas G. Kuntz, Terri Kelly, Geoffrey M. Rogers, and Winifred L. Thornton, as trustees under the last will and testament and codicils thereto of Alfred I. duPont, deceased ("Trustees"), and the Nemours Foundation, a not-for-profit

---

[1] The current appeal was commenced in the First District Court of Appeal and was transferred to the Fifth District Court of Appeal on January 1, 2023, based on the realignment of the courts.

corporation organized under the laws of Florida.[2]  Accordingly, we reverse the final judgment entered in favor of Appellees and remand for further proceedings consistent with this opinion. Because this appeal and the underlying litigation are unlikely to be the last dispute among and between these parties, we explain the reasons behind our decisions below.

The above-referenced series of litigated and appealed disputes between the DAG and Appellees involve, in one way or another, the charitable trust created by Alfred I. duPont's will (the "Trust") and the charitable foundation, Nemours Foundation, that was created with funds from the Trust.  Mr. duPont was a successful businessman and investor who lived in Delaware for a great deal of his life, later moving to Florida.  Mr. duPont's business acumen, ingenuity, and good fortune resulted in him amassing great wealth.  His success in the business world was matched by his charitable nature.  Thus, in his will, Mr. duPont directed that money be set aside in a charitable trust to provide medical care for children and the elderly.[3]  Being from Delaware, Mr. duPont included in his will and in the trust documents specific, clear direction that the children and elderly of Delaware were to receive priority and were to be taken care of before expending trust funds on children or elderly residing elsewhere.  Although the focus of the Trust and the Nemours Foundation was caring for those

---

[2] Appellee, Florida and its Attorney General were not sued in this case by Delaware; rather, Florida's Attorney General moved to intervene as a defendant, which motion was granted.

[3] Mr. duPont's will directed the Trustees to create "a charitable institution for the care and treatment of crippled children, but not of incurables, or the care of old men or old women, and particularly old couples, first consideration, in each instance, being given to beneficiaries who are residents of Delaware."  The Nemours Foundation became that entity with its various facilities providing such care.  DuPont noted his "wish that the people of Delaware needing the care of such institutions shall be properly provided for before contributions are made to institutions of any other state or states."

specific Delaware residents, both of those entities were established and administered in Florida where Mr. duPont had died.

As time went by, there were disagreements about, *inter alia*, whether the target residents in Delaware were being accorded proper priority and whether appropriate amounts of Trust funds were being expended for their benefit compared to charitable payments that were being made outside that state. There were disagreements as to the interpretation of the Trust. Prior litigation was sometimes initiated by the DAG on behalf of the children and elderly residents of Delaware who were allegedly being deprived of all that Mr. duPont had directed that they receive. The DAG was not involved in every suit concerning the Trust.

In the suit that resulted in *State of Delaware ex rel. Gebelein v. Florida First National Bank of Jacksonville*, 381 So. 2d 1075 (Fla. 1st DCA 1979), the DAG accused the Trustees of not properly carrying out their duties. Delaware sought legal and equitable relief. The trial court dismissed the case with prejudice after concluding that the DAG lacked standing and further finding that the complaint failed to state a cause of action. The First District discussed the general rule that the Attorney General of Florida was the sole litigant entitled to enforce the terms of a charitable trust and gave compelling reasons for that restriction. *Id.* at 1077. However, given the explicit language in the Trust which required primary and priority consideration of Delaware's young and old for receipt of charitable medical care from the Trust, the First District held that the DAG had standing to sue the trustees because of that state's "special interest" as representative of those Delaware residents. Additionally, the First District held "that the amended complaint states a cause of action." *Id.* at 1078. Accordingly, the trial court's order was reversed, and the case remanded for further action. *Id.*

Following *Gebelein*, the litigation resumed but was ultimately resolved by seeking the trial court's adoption of a "Stipulation and Agreement" executed by the parties, which repeated that the recipients of Delaware are to have priority in terms of spending from the Trust. In article F(3) of the Stipulation and Agreement, the Trustees "agree that at no time will more than fifty percent

(50%) annually of the funds distributed by the trust to Nemours be spent outside the State of Delaware" (the "50% Requirement"). The signatories to the Agreement were the State of Florida, the State of Delaware, the Trustees of the Alfred I. duPont Testamentary Trust, and the Nemours Foundation. The Agreement also acknowledged the role of the DAG in protecting the rights of the said Delaware beneficiaries of the duPont Trust.

In the litigation underlying this appeal and in its briefs, the DAG asserts that after honoring the 50% Requirement for decades, the Trustees "changed their methodology for allocating funds to Delaware," with the result that "substantially more than 50% of the funds distributed by the Trust to Nemours was being spent outside the State of Delaware." By the time the instant suit was filed, there were Nemours hospitals or health care facilities for children located in Delaware, Florida, Maryland, New Jersey, and Pennsylvania. The DAG alleged, *inter alia*, that the Trustees were expending trust funds in Maryland, New Jersey, and Pennsylvania which the Trustees then reported as being spent for "Delaware Operations" in order to facially achieve the requirement that at least 50% of annual trust allocations had to be devoted to Delaware. The complaint further asserted that the Trustees used a portion of trust funds that should have gone directly to Delaware to instead pay administrative expenses of Nemours facilities located throughout all five states. The DAG's complaint alleged that the Trustees consistently failed to account for the profits and positive cash flow generated by the Delaware facilities, presumptively from patient revenues, when reporting what percentage of the annual Trust allocations were being spent outside Delaware. The complaint further alleged that the Trustees were providing inaccurate, misleading financial reports in an effort to obscure the fact that less than 50% was being spent in Delaware.[4] According to the complaint, this all amounted to

---

[4] The DAG's complaint asserts that in 2016 no trust funds were spent to provide health care services in the state of Delaware. The Trustees reject that claim and point to the remarkable growth of the trust fund itself as well as the numerous health care facilities being operated by Nemours in Delaware for both children

diverting trust funds to other states that should have been expended in Delaware, thereby damaging the needy young and old residents of Delaware whom duPont had intended to primarily benefit from his charity.

In simple terms, the DAG's complaint used the same general factual allegations set forth as Count I, a breach of contract claim against Nemours and the Trustees, based on the Trustees not adhering to the 50% Requirement found in the Agreement, and as Count II, a claim for breach of trust against only the Trustees, based on them ignoring the explicit directives of duPont as set forth in his will and the Trust.

The Nemours Foundation and the Trust successfully moved to dismiss Count I. They argued that the Agreement was not enforceable as a contract because it was only a stipulation for entry of a judgment that was in fact entered. The trial court entered its written order dismissing this count; however, the order did not include a statement of reasons for granting the motions to dismiss Count I. Citing to *Gebelein*, the trial court denied the motions to dismiss Count II.

The parties conducted discovery as to Count II during the two plus years that followed. The Trustees and Florida's Attorney General moved for summary judgment arguing once again that the DAG lacked standing.[5] Nemours filed its joinder in the Trustees' motion for summary judgment. The trial court, a successor to the judge who previously denied the motions to dismiss Count II, granted the motions for summary judgment and ultimately entered final judgment in favor of Appellees and against the DAG. The DAG timely appealed. The details of the summary judgment arguments and the trial court's rulings will be discussed below after we analyze the dismissal of Count I, the breach of contract claim.

---

and the elderly. We recognize but do not undertake to resolve any of these factual disputes at this time.

[5] Count II only named the Trustees as defendants; however, Florida and the Nemours Foundation were allowed to intervene as defendants in order to contest that claim.

6

## I. Dismissal of Breach of Contract Claim

First, we address the trial court's dismissal of Count I, the breach of contract claim.

The Agreement, executed in 1980 by all the parties to this litigation, placed specific limitations on the Trustees with regard to annual spending of trust funds through the Nemours Foundation outside of Delaware.[6] The Agreement likewise once again provided for the priority of consideration for those same Delaware residents over those residing elsewhere. In the 50% Requirement clause found in Article F(3), "[t]he Trustees agree that at no time will more than fifty percent (50%) annually of the funds distributed by the Trust to Nemours be spent outside the State of Delaware."

The breach of contract claim, Count I, was terminated by granting motions to dismiss. "A motion to dismiss for failure to state a cause of action admits all well-pleaded facts as true, as well as reasonable inferences that may arise from those facts." *Palumbo v. Moore,* 777 So. 2d 1177, 1178 (Fla. 5th DCA 2001). "When considering a motion to dismiss, the trial court must treat as true all of the complaint's well-pleaded allegations, and it must look only to the complaint and its attachments." *Heisel v. City of Deltona*, 328 So. 3d 56, 57 (Fla. 5th DCA 2021).

---

[6] We note our colleague's dissent to reversing the dismissal of Count I as to the Nemours Foundation based on the fact that the Agreement literally placed the duty to comply with the 50% Requirement only upon the Trustees. The dissent asserts that because Nemours Foundation did not agree that it would comply with the 50% Requirement, it cannot be sued for an alleged breach of a non-existent promise. However, given that Nemours was a party to the Agreement, that trust allocations were received by Nemours, which in turn utilized those allocations for non-Delaware purposes, it is assertedly complicit in the expenditure of more than 50% of the trust benefits outside Delaware. Accordingly, we find that the Nemours Foundation cannot escape responsibility so simply.

Florida recognizes settlement agreements that resolve litigation to be favored and enforceable contracts. The cases relied upon by the DAG do indeed stand for that proposition. *See Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985) (citation omitted); *Hanson v. Maxfield*, 23 So. 3d 736, 739 (Fla. 1st DCA 2009) (citations omitted). The Trustees' argument that it was intended not as a stand-alone contract, but only as a stipulation for entry of a judgment, does not vary what was agreed upon nor by whom it may be enforced. *See Paulucci v. Gen. Dynamics Corp.*, 842 So. 2d 797 (Fla. 2003). It is fundamental that "(a) stipulation properly entered into and relating to a matter upon which it is appropriate to stipulate is binding upon the parties and upon the Court." *Dorson v. Dorson*, 393 So. 2d 632, 633 (Fla. 4th DCA 1981) (quoting *Gunn Plumbing, Inc. v. Dania Bank*, 252 So. 2d 1, 4 (Fla. 1971)).

Although the 2017 complaint goes into more detail, an overview reveals that the DAG alleged that the Trustees were spending far more than 50% annually of the funds distributed by the Trust outside of Delaware in contravention of the 50% Requirement, depriving the needy in Delaware the full measure of duPont's intended charity. Thus, the allegations of Count I, taken as true, are sufficient to support a claim that the Agreement is a contract between and among the parties, and that the Trustees have breached the 50% Requirement, which damaged actual and potential beneficiaries in Delaware. We find that Count I adequately states a cause of action which is to be resolved through litigation. Accordingly, we reverse the trial court's dismissal of Count I as to both the Trustees and the Nemours Foundation and remand for further proceedings.

## II. Summary Judgment on Breach of Trust Claim

Next, we discuss the summary judgment motions and explain how the trial court erred in entering summary judgment against the DAG on Count II, the breach of trust claim.

The primary thrust of Appellees' motions for summary judgment was to attack every basis for standing to sue on the part

8

of the DAG.[7]  The Trustees point out that under Florida's Trust Code, only the Nemours Foundation is a qualified beneficiary and thus entitled to sue the Trust.  *See* § 736.0110(1), Fla. Stat. (2020).  First, the Trustees argued that neither Delaware as a state nor the DAG were beneficiaries, much less qualified beneficiaries of the Trust under the controlling statute; thus, the DAG lacked standing to sue.  Second, Appellees pointed out that the Code provides that it is the Attorney General of Florida who "may assert the rights of a qualified beneficiary with respect to a charitable trust having its principal place of administration in this state."  § 736.0110(3), Fla. Stat.

Third, Appellees argued that *Gebelein* was a very old, narrow outlier of a decision that could not be reconciled with the 2007 and 2017 versions of Florida's Trust Code.  Appellees pointed out in their summary judgment motions that the First District in *Gebelein* initially discussed the general rule that only Florida's Attorney General could represent the interests of the beneficiaries of a charitable trust administered in this state.  Appellees asserted that the First District's recognition of a common law exception that would accord standing to a party with a special interest vis-à-vis a charitable trust was specifically limited to that one case.  They relied on the following language in *Gebelein* as proof that the DAG's standing to litigate matters relating to the Trust was limited to only that one case:  "[w]e therefore . . . hold that the Attorney General of Delaware has standing to maintain *this action*."  *Gebelein*, 381 So. 2d at 1078 (emphasis in Trustees' Motion for Summary Judgment).  As support for that very limited application, Appellees asserted that the First District declined to follow *Gebelein* in a more recent decision, *Biden v. Lord*, 147 So. 3d 632 (Fla. 1st DCA 2014), in which the DAG's attempt to intervene was rejected by the trial court and upheld on appeal.

---

[7] The Trustees' motion for summary judgment also urged the trial court to interpret the meaning of Article F(3) of the Agreement, the 50% Requirement, in a manner perhaps more favorable to the Trustees.  Having ruled that the DAG lacked standing, it denied that portion of the motion as moot.

Appellees further argued against the DAG's standing being based on *Gebelein* by asserting that the First District had failed to recognize in its decision that to permit the DAG to sue in place of Florida's Attorney General would somehow violate the separation of powers between at least two, if not all three, branches of Florida's government. The Trustees in their motion for summary judgment questioned the continued viability of *Gebelein*. Florida's Attorney General went further in its motion and argued that *Gebelein* was so flawed in its reasoning, lacking in analysis, limited in application, and outdated by revisions to Florida's Trust Code, that the trial court should refuse to follow it.

The trial court adopted each argument advanced by Appellees and granted their motions for summary judgment. However, it erred in so doing.

First, the trial court rejected that the Agreement conferred standing upon the DAG. It found the statement that the DAG was the proper representative of the people of Delaware was only in a "whereas clause" which the court described as inessential to the Agreement. It further rejected the Agreement as supporting the DAG's standing, stating that standing could not be conferred by consent. In reaching those conclusions, the trial court ignored the parties' agreement and the fact that the Agreement had been adopted and incorporated into a judgment by a court of competent jurisdiction. This was error.

Next, the trial court analyzed whether the DAG could have standing consistent with the revisions to Florida's Trust Code. The trial court concluded that under the revised Code, suit could be brought against a charitable trust only by: (1) the qualified beneficiaries of the charitable trust; (2) its trustees; (3) the settlor; and (4) Florida's Attorney General. We need not analyze these findings because *Gebelein* employed a common law rule which provides a solid basis for the DAG to have standing in this type of suit involving this Trust. As noted by the DAG and conceded by Appellees, Florida's Trust Code provides that "[t]he common law of trusts and principles of equity supplement this code, except to the extent modified by this code or another law of this state." § 736.0106, Fla. Stat. The Trustees' separation of powers argument likewise fails given the application of the common law special

10

interest doctrine which supplements the statutory list of those who may sue a charitable trust. Thus, unless there is some reason to ignore *Gebelein*, that was the applicable law.

We find that the special interest doctrine discussed and relied upon in *Gebelein* to afford standing to the DAG in a suit involving this Trust and the issues at hand makes imminent sense and has a sound legal basis. Accordingly, we agree with and adopt the reasoning of *Gebelein* to that extent. Courts should avoid overly-literal application or "interpretation [of text] that would result in an absurd or ridiculous conclusion." *M.D. v. State*, 993 So. 2d 1061, 1063 (Fla. 1st DCA 2008). We find absurd the Appellees' and trial court's statement that *Gebelein* cannot be applied to any other case because the First District announced that it held "that the Attorney General of Delaware has standing to maintain *this action*." *Gebelein*, 381 So. 2d at 1078 (emphasis added by both Appellees and the trial court in its order). Almost every appellate decision directly concerns only a single case. However, the principles of law announced in one opinion by a district court are to be applied by trial courts within the district to substantially similar situations. It is noteworthy that the trial court was unable to support that unreasonably narrow reading with any authority whatsoever.

The trial court essentially proceeded as though it had the power to overturn the First District's decision in *Gebelein*. It announced that the case was wrongly decided for each of the reasons argued by Appellees and the trial court refused to follow *Gebelein* despite the fact that it was issued by the district court of appeal then having jurisdiction over that trial court.[8]

First, the trial court ruled that *Gebelein* had been legislatively overruled by adoption of Florida's revised trust code. Granted, changes to Florida's trust code post-*Gebelein* removed Florida's state attorneys from having authority or responsibility for

---

[8] When summary judgment was granted, the Fourth Circuit was within the First District. When the district courts of appeal were realigned effective January 1, 2023, the Fourth Circuit became part of the Fifth District.

11

enforcing the terms of charitable trusts, vesting that instead in Florida's Attorney General. *See* Ch. 2017-155, § 5, Laws of Fla.; § 736.0110(3), Fla. Stat. (2023). However, the Trust Code did not address, much less eliminate, standing for those who have a special interest. The DAG's reliance upon *Thornber v. City of Fort Walton Beach,* 568 So. 2d 914 (Fla. 1990), is appropriate and persuasive. "The presumption is that no change in the common law is intended unless the statute is explicit and clear in that respect." *Id.* at 918. Had the Legislature intended to recede from *Gebelein*, specifically, or the special interest doctrine, generally, when revising the Trust Code, it certainly could have by so stating. And, the Legislature has previously demonstrated its willingness to explicitly overrule specific cases. *See* Ch. 2011-215, § 2, Laws of Fla. (explicitly overruling *D'Amario v. Ford Motor Co.*, 806 So. 2d 424 (Fla. 2001)). Thus, summary judgment in favor of Appellees cannot rest on that non-existent foundation.

The trial court next suggested that the First District, while not explicitly overruling *Gebelein*, refused to extend it to the circumstances in *Biden v. Lord*, 147 So. 3d 632. However, *Biden* dealt with a far different situation than that presented in *Gebelein* or the instant litigation. In *Biden*, the DAG had not attempted to commence a new suit or even to simply intervene in an ongoing case. Rather, it attempted to re-open matters that had gone to judgment eight years earlier. *Id.* at 637. The First District upheld the trial court's denial of the DAG's post-judgment motion to intervene. *Id.* at 634. In so doing, the First District agreed with the trial court's assessment that in that case, the DAG was not an indispensable party. *Id.* at 635. Thus, the issues in *Biden* were not whether the DAG had standing but rather, whether its initial absence from the suit was fatal to the outcome, and whether the DAG had waited too long to join the litigation. Those are indeed different issues than found in *Gebelein*; thus, the ruling in *Biden* in no way can be viewed as receding from or limiting *Gebelein*.

It is clear then that *Gebelein* was neither legislatively nor judicially overruled. Despite its best efforts, the trial court was powerless to overrule those decisions. While a trial court may certainly question the soundness of a district court of appeal's decision, it clearly has no authority to do anything other than follow those decisions which are on point. As argued by the DAG,

when the governing district court has decided an issue, the trial courts within that district are required to follow its decision. *Pardo v. State*, 596 So. 2d 665, 667 (Fla. 1992); s*ee State v. Hayes*, 333 So. 2d 51, 53 (Fla. 4th DCA 1976).

We further observe that, as to the standing of the DAG when suing the Trust and Nemours Foundation regarding the expenditure of trust funds in accordance with the 50% Requirement and general trust administration, relitigating that issue is precluded by the doctrine of collateral estoppel as having previously been litigated between the same parties and judicially determined. *State v. McBride*, 848 So. 2d 287, 290–91 (Fla. 2003). The only standing-related issue not previously litigated is whether the Legislature's amendment of the Trust Code impacted the standing of the DAG; thus, it was fair game. Nevertheless, for the reasons stated above, we hold that the amendment does not impact the standing of any party to the action.

Thus, the trial court erred in finding that the DAG lacked standing and by granting summary judgment on that basis.

## Conclusion

We find that the trial court reversibly erred in dismissing the DAG's breach of contract claim alleging breach of the Agreement which had been executed by and between the same litigants. For the reasons set forth above, we hold that the trial court was powerless to ignore *Gebelein* which was, at that time, directly binding precedent that the trial court was obliged to follow. We hereby adopt the reasoning of *Gebelein* that the Attorney General of Delaware has standing in this duPont Trust litigation because of the special interest doctrine discussed above.

We remand for further proceedings in accord with this opinion.

REVERSED.

HARRIS, J., concurs;
MAKAR, J., concurs in result only, with opinion;
EDWARDS, C.J., concurs in part and dissents in part, with opinion.

MAKAR, J., concurring in result.

At issue is the enforcement of a settlement agreement entered in 1980 by the Attorneys General of Delaware and Florida with a testamentary trust and foundation established pursuant to the will of Alfred I. duPont, a member of one of the wealthiest and most philanthropic families in American history. Despite long-standing precedent explicitly allowing the Attorney General of Delaware to enforce the settlement agreement on behalf of Delaware beneficiaries, the trial court ruled that Delaware lacked standing to do so, overturning a decision of the First District Court of Appeal that is directly on point, a case involving the same parties and the enforcement of the same settlement agreement. What follows is a brief history of the trust litigation and the 1980 settlement agreement that has undergirded more than four decades of the duPont financial legacy; after that is the explanation of why the trial court's ruling, which barred Delaware's lawsuit, was erroneous.

I.

A. DuPont's Will

DuPont was born in 1864 in Delaware where he spent most of his life in business before moving to Jacksonville, Florida, at age 62 in 1926, with his third wife, Jessie Ball duPont, a retired teacher who became instrumental in his business dealings and their philanthropic activities.

Prior to his death in 1935, duPont's endeavors shaped much of Jacksonville's business, civic, and charitable history, resulting in the operation of important institutions such as Florida National Bank and the construction of prominent architectural icons such as Epping Forest, a 58-acre riverfront estate that served as Jessie Ball duPont's home until her death in 1970. DuPont's business interests spanned the Florida panhandle as well, resulting in the acquisition of tens of thousands of acres of timberland, the establishment of the St. Joe Paper Company, and the development

14

of highway infrastructure to service the region that continues to this day (U.S. Routes 98, 90, and 17).

DuPont—in tandem with his wife, Jessie—wanted to do good things with the enormous wealth they controlled. In his will, duPont said:

> [I]t has been my firm conviction throughout life that it is the duty of every one [sic] in this world to do what is within his power to alleviate human suffering. . . . It is, therefore, natural that I should desire, after having made proper provision for the immediate members of my family and the others whom I have seen fit to remember, that the remaining portion of my estate be utilized for charitable needs.

To fulfill his testamentary vision, duPont's will created a trust to fund a

> charitable institution for the care and treatment of crippled children, but not of incurables, or the care of old men or old women, and particularly old couples, first consideration, in each instance, being given to beneficiaries who are residents of Delaware, the one or more of which said charitable purposes, however, being left to the decision of my said Trustees[.]

The will provided that "the people of Delaware needing the care of such institutions shall be properly provided for before contributions are made to institutions of any other state or states[.]" Neither Florida nor its residents are mentioned in the will as beneficiaries.

Pursuant to duPont's will, the Alfred I. duPont Testamentary Trust was created. The Trust was operated much like other major businesses with vast financial and physical assets: it continued to manage holdings in the banking industry, its paper/box production facilities and timberlands, and other sizable companies. For example, it acquired the Florida East Coast Railway as a major

15

strategic transportation asset. The Trust administered the individual legacies, bequests, and annuities specified in duPont's will, which would be gradually fulfilled, resulting in a surplus of assets and funds over time.

### B. The Trust and Nemours Foundation

In 1936, this residual portion of duPont's assets was placed in a perpetual trust named the Nemours Foundation,[9] which henceforth grew dramatically, supporting the humanitarian purposes that duPont and his wife envisioned. She served as a trustee of the Trust and a member of the Nemours Foundation directorship; her brother, Edward Ball, was involved in all aspects of the duPont business operations as he was duPont's close friend and his "right hand man" in all business dealings.

To promote duPont's vision of caring for children with physical disabilities and establishing medical research programs, the Nemours Foundation created the Alfred I. duPont Institute, based in Wilmington, Delaware, where construction of a major health care facility and pediatric orthopedic hospital began in 1939. Expansion of facilities and programs in Delaware continued for decades, resulting in one of the largest pediatric health care systems in the country.

During the 1940s, the Nemours Foundation expanded its outreach within Florida and decided to partially fund the work of the Florida Crippled Children's Commission as well as dozens of other pediatric care organizations in the State. Decades later, the Institute made even greater strides, deciding to transform and broaden its mission by purchasing a children's hospital in Jacksonville, Florida, in 1981. A decade later, the Nemours Children's Clinic—a pediatric health care facility and hospital— was opened in Jacksonville. Facilities in Orlando and Pensacola

---

[9] "The name 'Nemours' was part of the family name and the name of the 300-acre and 'mansion house' where Mr. and Mrs. duPont lived when in Wilmington, Delaware." *The Estate of Alfred I. duPont and the Nemours Foundation* 9 (Est. of Alfred I. duPont 1974).

were established, creating an increasingly statewide pediatric health care presence in Florida.

For decades, the Trust and Nemours Foundation thrived financially, resulting in the expansion of pediatric facilities in Delaware and support for services in Florida; both states were desirous of additional pediatric facilities and services. After Jessie Ball duPont's death, however, controversy arose over the management and financial dealings of the Trust and the Nemours Foundation, eventually resulting in litigation in Florida state courts over the enforcement of the terms of duPont's will, specifically the provisions regarding the Trust's and the Nemours Foundation's responsibilities to provide for the care of the only beneficiaries specified, i.e., children and the elderly who are Delaware residents.

## C. *Gebelein I*

A legal flashpoint—involving the same parties to this litigation—arose in the late 1970s when the then-Attorney General of Delaware, Richard S. Gebelein,[10] sued the Trust and the Nemours Foundation for serious alleged managerial and financial improprieties.

> Delaware filed a complaint against the trustees of the duPont Trust as trustees and as members, officers and directors of the Nemours Foundation, and against certain of the trustees individually. The complaint sought injunctive relief, the removal of some of the trustees, the appointment of a temporary trustee, surcharges and other relief.

*State of Del. ex rel. Gebelein v. Fla. First Nat'l Bank of Jacksonville*, 381 So. 2d 1075, 1076 (Fla. 1st DCA 1979) (*Gebelein I*). The basis for Delaware's standing and lawsuit was grounded in the language of duPont's will, which gave "first consideration" to beneficiaries

---

[10] Gebelein was Delaware's Attorney General from 1979 to 1983.

17

who are Delaware residents. As was explained by the First District in 1979:

> Under the terms of the trust, after Mrs. duPont's death, the net income of the trust was to be paid over "at convenient intervals" to the Nemours Foundation "for the purpose of maintaining 'Nemours' as a charitable institution for the care and treatment of crippled children, but not of incurables, or the care of old men or old women, and particularly old couples, *first consideration, in each instance, being given to beneficiaries who are residents of Delaware. . . .*"

*Id.* at 1076 (emphasis added) (quoting Item 9 in duPont's will). Similarly, Item 10 in duPont's will specified that "surplus income may from time to time" be used to contribute to "other worthy charitable institutions" for pediatric and geriatric care, but that it was his "wish that the people of Delaware needing the care of such institutions shall be properly provided for before contributions are made to institutions of any other state or states."

Unlike Delaware, no other state—including Florida—was mentioned as having resident beneficiaries. Like all other states, Florida's residents might be eligible for pediatric and geriatric services or facilities, but only if Delaware beneficiaries were "properly provided for" in the first instance.

The State of Delaware, on behalf of its resident beneficiaries, sought to enforce duPont's testamentary intent. Delaware's initial complaint was dismissed without prejudice for failure to state a cause of action, resulting in the filing of a multi-count amended complaint alleging numerous improprieties.

> Count I of the amended complaint seeks judicial construction of the trust provisions pursuant to Section 737.201, Florida Statutes (1977), and asks the court to declare among other things that the charitable purpose of the duPont Trust has been defeated. Count II alleges continuing violations of Section 738.12, Florida Statutes

18

(1977), from 1970 to the present by the trustees holding unproductive assets, specifically the stock in St. Joe Paper Company and shares of Florida National Bank of Florida, Inc. Count III alleges the Trustees' failure to administer the trust diligently for the benefit of the beneficiaries. Count IV alleges conflicts of interest in violation of Section 737.403, Florida Statutes (1977). Count V charges the trustees with willfully subverting the intent of the duPont Trust by refusing the Board of Managers of Nemours' requests for funds when the money is available. Count VI alleges additional wrongful acts of the trustees in order to obtain control of the trust. Count VII alleges that the beneficiaries are suffering irreparable harm as a result of the alleged mismanagement of the trust.

*Id.* at 1076–77. Florida's then-Attorney General, Robert L. Shevin,[11] filed an amicus brief in support of Delaware, arguing that denying a state's attorney general the legal standing to vindicate the interests of those "specifically identified as the primary beneficiaries of a charitable trust *simply because that trust is administered in another state*, would severely inhibit the attorney general's ability to fulfill the fiduciary duty imposed upon him by Anglo-American jurisprudence as early as the sixteenth century." (Emphasis added). The amicus brief was joined by twenty-nine other states.[12]

---

[11] Shevin served as Florida's Attorney General from 1971 to 1979. He was succeeded by Jim Smith, who served from 1979 to 1987.

[12] Those states were Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin and included state attorneys' generals, one who became a U.S. Supreme Court Associate Justice (David

The amended complaint was dismissed as well, this time with prejudice, such that no further amendment was allowed. The trial court's rationale was that Delaware did not have the requisite legal standing to bring suit and that the counts alleged in its amended complaint did not state any recognized causes of action. *Id.* at 1077. Delaware appealed.

The First District reversed, saying the "first question to be resolved by this appeal is whether Delaware has standing to maintain a suit against the duPont trustees." *Id.* The appellate court detailed the legal arguments:

> Delaware contends that the Attorney General of Delaware, as the lawful representative of Delaware beneficiaries, has standing to maintain a suit to enforce a charitable trust where the trust specifies that the primary beneficiaries are to be residents of Delaware. The Trustees argue that the beneficiaries of a charitable trust have no standing to bring an action to enforce the trust and that only the Attorney General of Florida or a trustee of the trust has the right to enforce charitable trusts being administered in Florida, unless the trust instrument or the Florida Legislature provides otherwise.

*Id.* (footnote omitted). The court noted that the trustees were not united in their opposition to Delaware's position.[13]

---

Souter), a U.S. President (Bill Clinton), a U.S. Attorney General (John Ashcroft), a U.S. Senator (Slade Gorton), and Francis X. Bellotti of *First National Bank of Boston v. Bellotti* fame.

[13] Four Trustees as well as the Florida First National Bank of Jacksonville, Jacksonville National Bank, and the Nemours Foundation opposed Delaware, but "Trustee Dent filed a separate brief supporting Delaware's standing to bring suit." *Gebelein I*, 381 So. 2d at 1077 n.1.

The First District rejected the Trust's and Nemours Foundation's position, recognizing the importance of the role of state attorneys general in the enforcement of charitable trusts.

> As a general rule, only the Attorney General may enforce a charitable trust. Unlike a private trust, where there are identifiable beneficiaries who are the equitable owners of the trust property, the beneficiaries of a charitable trust are the public at large. Whereas beneficiaries of a private trust have the power to maintain a suit to enforce the trust, the public must act through some public official to maintain such a suit.

*Id.* It explained why—according to a prominent treatise—the power to enforce a charitable trust is generally placed in a public official, typically a state attorney general.

> "The purpose of vesting in some public official such as the Attorney General the exclusive power to begin proceedings to enforce charitable trusts is obvious. The persons affected by such trusts are usually some or all of the members of a large and shifting class of the public. If any member of this class who deemed himself qualified might begin suit, the trustee would frequently be subjected to unreasonable and vexatious litigation. Often no given individual can prove that he will necessarily benefit from the charity. All may be prospective or possible beneficiaries, but no one can be said to be a certain recipient of aid. In ultimate analysis it is the public at large which benefits, and not merely the individuals directly assisted. Obviously, there is good reason for vesting in a single authority the discretion and power incident to the enforcement of such trusts, rather than in leaving the matter to the numerous, changing, and uncertain members of the group directly to be aided."

*Id.* (quoting Bogert, *Trusts and Trustees* § 411 (rev. 2d ed. 1977)).

The appellate court noted, however, that "it has been recognized that *an entity other than the Attorney General can be a proper party to bring suit to enforce a charitable trust.*" *Gebelein I*, 381 So. 2d at 1077 (emphasis added). Based on this established principle, standing to sue extended to not only the trustees but also to any person or organization with a special interest in or special status under the trust. *Id.* ("Trustees have been permitted to bring suit against co-trustees, and persons or organizations having a special interest in a trust or a special status under a trust instrument are considered to have standing to enforce the trust." (citing three prominent treatises)). In addition, the court noted that under Florida law "a party alleging a special interest, an interest beyond that general interest possessed by the public at large, has standing to bring suit." *Id.* at 1077–78.

Allowing standing and proper party status to trustees and others with a special interest or status in a charitable trust is consistent with the principle of restricting the reach of standing to enforce charitable trusts.

> The reason for requiring a special interest is the same reason for the general rule that only the Attorney General may bring suit to enforce a charitable trust:
>
> If it were otherwise there would be no end to potential litigation against a given defendant, whether he be a public official or otherwise, brought by individuals or residents, all possessed by the same general interest[.]

*Id.* at 1078 (citation omitted). In other words, to avoid having too many cooks in the kitchen, access is limited to only those with demonstrably special and specific needs.

In applying these principles to the controversy between Delaware and the Trust and Nemours Foundation, the First District sided with Delaware, holding that it has the requisite

special interest on behalf of Delaware beneficiaries to have standing.

> We believe that *the people of Delaware have a special interest in the enforcement of the duPont Trust. The terms of the trust give the people of Delaware a special status not enjoyed by the public at large. The Attorney General of Delaware represents the people of Delaware and is the proper party to bring suit on their behalf.* We therefore reverse the trial court and hold that *the Attorney General of Delaware has standing to maintain this action.*

*Id.* (emphases added). The appellate court also held that Delaware had stated causes of action against the defendants including the failure "to administer the trust for the benefit of the beneficiaries" that Delaware represented.

As such, the court in *Gebelein I* rejected the view that only the Florida Attorney General had standing to sue to enforce the duPont charitable trust; instead, both Attorneys General had standing, the former as the Florida official charged with overseeing charitable trusts, the latter as the Delaware official with a special interest in enforcement of the duPont trust on behalf of Delaware beneficiaries who have a special status that the general public lacks.

### D. The 1980 Settlement Agreement

On remand, the parties litigated Delaware's claims, ultimately entering a settlement agreement dated January 17, 1980. The eleven-page document was titled "Stipulation and Agreement between the State of Florida, the State of Delaware, the Trustees of the Alfred I. duPont Testamentary Trust and the Nemours Foundation" ("Settlement Agreement"). The agreement stated that Delaware Attorney General Gebelein "is the representative of the Delaware charitable beneficiaries of the Alfred I. duPont Testamentary Trust and of The Nemours Foundation, and as head of the Department of Justice of the State of Delaware is charged with protecting the rights of the said

23

Delaware beneficiaries." Based on this special interest and status, Delaware was a direct signatory and party to the agreement and allowed to intervene in a related lawsuit involving the Trust.

The Settlement Agreement set forth the terms and conditions to which the parties had agreed including valuation of trust assets for 1978, 1979, and "for years subsequent to 1979," as well as many provisions related to ensuring that the interests of Delaware beneficiaries were met on an ongoing basis. For instance, the trustees "agree[d] that they will broaden the scope and nature of services presently being offered at the Alfred I. duPont Hospital at Wilmington, Delaware, contingent upon the availability of necessary funds." The Nemours Foundation was required to "communicate to every hospital in the State of Delaware its willingness and intention to treat every" afflicted child in Delaware without regard to the ability to pay (but expecting those who can pay will do so). A contingency reserve of $225,000,000 was established to ensure the ongoing operation of hospital facilities located on the Nemours estate in Delaware.

Of importance, the agreement resolved the contentious issue of the amount of trust funds that could be expended other than in Delaware, which was the only state whose residents were named as beneficiaries in duPont's will. The agreement emphasized what duPont clearly required in his will: that "first consideration" for each distribution from the Trust "be given to the beneficiaries who are residents in Delaware."

To resolve the matter, the parties to the Settlement Agreement established a fixed percentage for the distribution of funds in the future. The agreement specified that the duPont trustees "agree that at no time will more than fifty percent (50%) annually of the funds distributed by the Trust to Nemours be spent outside the State of Delaware." Under this "50% requirement," if the Trust distributed $100 million of funds annually, no more than $50 million could be distributed in states other than Delaware. The Trust could, of course, decide to spend the entire $100 million in Delaware, but it could not distribute $75 million in Florida and $25 million in Delaware; the latter would be a breach of the agreement the parties—which included the Trust—had reached.

24

Notably, the Settlement Agreement explicitly contemplated potential future litigation of its terms and conditions by the parties. Under the section entitled "Implementation of the Agreement," it specifically stated that:

> The Attorney General of Florida, the Attorney General of Delaware, and the State Attorney for the Fourth Judicial Circuit of Florida, while continuing to closely observe the operations and activities of the Trust will desist from filing any new litigation, relating to the subject matter of this agreement, *as long as the Trustees comply with this Agreement.*

(Emphasis added). Although the state and local officials were to avoid filing any new litigation on matters resolved in the agreement, the highlighted language clearly allowed for litigation by the state or local officials if a failure to "comply with this Agreement" were to occur. The Settlement Agreement did not prohibit new litigation involving any newly discovered improprieties that adversely impacted Delaware beneficiaries.

### E. Litigation Under the Settlement Agreement

Litigation arose soon thereafter because the trustees failed to comply with the Settlement Agreement. As the First District stated in *State of Delaware ex rel. Oberly v. Belin*:[14]

> *This litigation commenced in 1981 when the Attorneys General of Delaware and Florida alleged that the trustees had violated a 1980 settlement agreement.* That settlement agreement was entered into after a previous action was filed by the State of Delaware. In that case, the trial court had dismissed the Delaware Attorney General's complaint partly based on a conclusion that the Attorney General for the State of Delaware did not have standing to bring

---

[14] Oberly was the Attorney General of Delaware from 1983 to 1995.

25

> the suit. That conclusion was reversed by this court in [*Gebelein I*], 381 So.2d 1075 (Fla. 1st DCA 1979). This court found that the people of Delaware had a special interest in the enforcement of the trust, and that the Attorney General of Delaware was the proper party to represent the people of that state. After [the] decision in [*Gebelein I*], the parties entered into the above referenced settlement agreement.

453 So. 2d 1177, 1177–78 (Fla. 1st DCA 1984). The appellate court continued, noting that the Attorney General of Delaware had prevailed in its lawsuit to enforce the Settlement Agreement by proving a massive undervaluation of trust assets.

> The outcome of the current action, *which was based on alleged breaches of the settlement agreement,* was a finding that the trustees had been undervaluing the fair market value of the trust's principal asset by approximately $164,000,000. This finding resulted in a requirement that approximately $5,000,000 in additional income be paid to the beneficiaries.

*Id.* at 1178. As indicated, the undervaluation resulted in $5 million of remedial income to be paid to the beneficiaries of the Trust. Because of its "protracted quest to protect the special interests of the Delaware beneficiaries," the Delaware Attorney General sought to recover attorneys' fees that it had paid for Florida counsel, which the trial court denied.

On appeal, the legal question was whether Delaware was entitled to recover its attorneys' fees because its attorney general was representing Delaware beneficiaries with a special interest rather than the public at large. In rejecting Delaware's argument, the First District first recounted that the trustees had taken the position that

> the Attorney General of the State of Florida was the only proper party. However, that contention was rejected by this court in [*Gebelein I*]. In that

26

> case, this court held that the Attorney General of the State of Delaware was also a proper party because he was representing a special interest of the people of Delaware, in that the trust particularly provides that first consideration be given to beneficiaries . . . who are residents of Delaware.

*Id.* The First District thereby, once again, reiterated that the Attorney General of Delaware was a proper party to enforce the Settlement Agreement at issue. The court nonetheless declined to award attorneys' fees because it determined that the Delaware Attorney General's representation of Delaware beneficiaries was part and parcel of what attorneys general do: represent the public in charitable trust matters as well as those with a special interest who are unable to represent themselves, such as the children and elderly in this case. *Id.* at 1179.

Additional litigation to enforce the Settlement Agreement occurred, though not in favor of Delaware and Florida. In *State of Delaware ex rel. Gebelein v. Belin*, 456 So. 2d 1237, 1238 (Fla. 1st DCA 1984) (*Gebelein II)*, the Attorneys General of Delaware and Florida sued the Trust claiming that it had violated the prudent trustee rule and breached the Settlement Agreement. The trial court ruled in the Trust's favor and the First District affirmed.

The appellate court reemphasized the history of the parties' prior litigation, noting that the lawsuit at issue was based on enforcement of the terms of the Settlement Agreement as well as the failure of trustees to abide by standards applicable to prudent investments and avoiding conflicts of interest that violated trustees' fiduciary duties. *Gebelein II*, 456 So. 2d at 1239–40. It noted that after execution of the Settlement Agreement, Delaware "charged a breach of the Stipulation and Settlement Agreement by the Trustees' failure to make a fair market valuation of the St. Joe stock" and "by the Trustees' failure to raise Trust income above 3 percent of the total value of the Trust corpus." *Id.* at 1239. Other claims were asserted, but all were eventually denied by the trial court, the appellate court affirming that "no breach of the agreement" occurred as to the Trustees' "working to raise the productivity of the Trust" *Id.*

Similarly, in *Smith v. Belin*, 456 So. 2d 1242 (Fla. 1st DCA 1984), the Attorneys General of Florida (Smith) and Delaware (Oberly) challenged a joint venture between the Trust and the Florida East Coast Railway. The trial court approved the joint venture (though it was abandoned during litigation), and the First District rejected the Attorneys Generals' arguments that the trustees were not acting in furtherance of a duty to raise the productivity of the trust. *Id.* at 1243 & n.1. As such, litigation over the trust and the terms of the Settlement Agreement has continued sporadically for decades, oftentimes with the involvement of the Attorneys General of Delaware and Florida and sometimes without one or the other. *See Biden v. Lord*, 147 So. 3d 632, 635 (Fla. 1st DCA 2014) (recounting history of litigation).

## F. Litigation Under the Settlement Agreement – 2017

With this historical backdrop of long-standing and protracted litigation against the Trust and the Nemours Foundation by the Attorneys General of Delaware and Florida involving the Settlement Agreement, it came as no surprise that similar litigation—involving the identical parties to those in the *Gebelein* cases—arose once again. In April 2017, Delaware Attorney General Matthew Denn[15] sued the Trust and Nemours Foundation on behalf of the Delaware beneficiaries, claiming breaches of the Settlement Agreement and breaches of trust/fiduciary duties. These claims were styled as a breach of contract (i.e., the Settlement Agreement) (Count I) and a breach of trust (i.e., a breach of the trust's requirement that Delaware residents must receive "first consideration" and be properly provided for before trust distributions are made to any other states) (Count II). The State of Florida was not named as a party but was notified immediately of the lawsuit via a courtesy copy from Delaware and thereafter intervened unopposed.

---

[15] Denn served as Delaware Attorney General from 2015 until 2019 when Delaware's current Attorney General, Katherine Jennings, substituted for him in the lawsuit.

28

The lawsuit focuses on how the Trust and Nemours classified and utilized patient revenues (which were in the hundreds of millions of dollars annually) and the vast infusions of trust funds to bolster the deteriorating financial condition of a new Nemours hospital in Central Florida. The gist of the lawsuit is that these actions resulted in a major deviation from the 50% Requirement in the Settlement Agreement (i.e., that no more than fifty percent of trust distributions could be to states other than Delaware). Stated differently, disproportionate trust distributions to Florida operations breached the requisite 50% allocation in the Settlement Agreement as well as trustees' duties to Delaware beneficiaries.

In September 2017, the Trust moved to dismiss the lawsuit, joined by Florida; Nemours also moved to dismiss. The trial judge at the time dismissed Count I (breach of contract) without a written explanation but allowed Count II (breach of trust duties) to proceed under the *Gebelein I* precedent.

In January 2021, after resolution of premature appeals from the dismissal order,[16] the Trust and Florida filed motions for summary judgment arguing that Delaware lacked standing and similar arguments previously made in their motions to dismiss. They argued that the *Gebelein I* decision, which governed the parties' relationship since 1979, was no longer binding precedent for three reasons: the Florida trust code had changed in recent years, the First District in the *Biden* decision had altered that decision, and *Gebelein I* was wrongly decided. Delaware countered that *Gebelein I* remained binding precedent, nothing in the Florida trust code or the *Biden* case altered that decision, and Delaware continued to have standing and the right to enforce the Settlement

---

[16] Delaware appealed the dismissal of Count I to the First District (which was dismissed before it was briefed and without reaching the merits). *See Denn v. Durden*, Case No. 1D18-2705. The Trust filed a petition for writ of certiorari to that same court, claiming error in the failure to dismiss Count II. The petition for writ of certiorari was briefed and argued but was also dismissed without reaching the merits. *See Durden v. Jennings*, 262 So. 3d 697, 697 (Fla. 1st DCA 2019).

Agreement on behalf of Delaware beneficiaries under the special interest/status doctrine.

In a thirty-five-page order dated November 16, 2021, the trial judge (who substituted after the initial judge's retirement) granted summary final judgment for the Trustees and Florida, adopting their arguments in their entirety,[17] ruling that *Gebelein I* was no longer binding precedent or otherwise applicable to the long-standing relationship and responsibilities set forth in the parties' 1980 Settlement Agreement. It concluded that *Gebelein I*'s holding, which specifically granted standing to the Delaware Attorney General, was limited to just that case and no others; it also held that *Gebelein I* was wrongly decided on separation of powers grounds, concluding that the First District in *Gebelein I* "lacked subject matter jurisdiction to allow the Delaware AG to maintain his action, in his official capacity, for breach of a Florida trust." Delaware appealed to the First District and briefing was complete as of December 2022; the case was thereafter transferred to the Fifth District on January 1, 2023.

II.

On appeal, Delaware raises two related issues. The first issue is whether the trial court erred in dismissing Count I, which asserted a breach of the Settlement Agreement. Delaware claims the Settlement Agreement is a binding and enforceable contract, incorporated into an enforceable judgment, that has been routinely enforced in the past. The Trust counters that the Settlement Agreement is not enforceable as a contract; instead, the Settlement Agreement's only purpose was to modify the Trustees' duties via the judgment that was entered. The second issue is whether the trial court erred in dismissing Count II, which asserted breaches of the Trust's duties to the Delaware beneficiaries. Delaware claims that the trial court erred in overruling the First District's decision in *Gebelein I*, which remains binding precedent. The Trust claims, however, that *Gebelein I* has been tacitly overruled by changes in Florida's trust code and, in any event, was incorrectly

---

[17] At the conclusion of the hearing on the motion for summary judgment, the trial judge requested that the parties submit proposed orders for the court's consideration.

decided on separation of powers grounds. As next discussed, Delaware's positions are the correct ones.

A. Enforcement of the Settlement Agreement (Count I).

Based upon well-established principles of Florida law, Delaware's position—that the trial court erred in dismissing the breach of contract claim in Count I because the 1980 Settlement Agreement is a binding and enforceable contract—is correct. It was erroneous for the trial court to dismiss Count I because it clearly states a breach of contract claim for violations of the Settlement Agreement;[18] that it was incorporated into a court judgment does not make it any less enforceable. This conclusion is bolstered by the fact that litigation enforcing the Settlement Agreement has previously occurred without objection as confirmed by precedent involving the same settlement agreement and the same parties in this case.

This Court and others universally hold that "[s]ettlement agreements are highly favored and once entered, are binding upon the parties and the courts." *Crosby Forrest Prods., Inc. v. Byers*, 623 So. 2d 565, 567 (Fla. 5th DCA 1993). It is well-established that although "a settlement agreement may be the basis upon which a judgment may be entered, *it is also a contract between the parties, the enforceability of which is governed by the laws of contract.*" *Patel v. Ashco Enters., Inc.*, 711 So. 2d 239, 240 (Fla. 5th DCA 1998) (emphasis added); *see also Gallagher v. Dupont*, 918 So. 2d 342, 347 (Fla. 5th DCA 2005) (same). Likewise, the Florida Supreme Court has held that,

> when a court incorporates a settlement agreement into a final judgment or approves a

---

[18] Nemours's motion to dismiss Delaware's breach of contract claim mirrored that of the Trust (i.e., that no enforceable agreement exists), but also claimed Nemours had no legal obligation under the 1980 Agreement to comply with the 50% requirement. The dismissal order did not address this latter claim, and Nemours has only argued the former point on appeal. Count I states a claim for breach of contract against Nemours, whose scope of contractual obligations is indeterminate at this juncture.

31

settlement agreement by order and retains jurisdiction to enforce its terms, the court has the jurisdiction to enforce the terms of the settlement agreement even if the terms are outside the scope of the remedy sought in the original pleadings.

*Paulucci v. Gen. Dynamics Corp.*, 842 So. 2d 797, 803 (Fla. 2003). Remedy may be sought in the court that approved the settlement agreement or, alternatively, if a party seeks a remedy not specified in the settlement agreement, the "appropriate action would be to file a separate lawsuit." *Id.* What matters most is that the terms of the settlement agreement are enforceable as a contract.

In this regard, the Settlement Agreement is—and has been since its inclusion in the 1980 final judgment—a binding and judicially enforceable contract to which the identical parties in this case agreed and which has governed their relationships since that time. The parties—Delaware's Attorney General, Florida's Attorney General, the Trust, and Nemours—negotiated and then entered the Settlement Agreement "in consideration of the mutual promises and covenants contained" therein. All the elements of a judicially enforceable contract exist; distinctions in nomenclature are irrelevant because the Settlement Agreement is clearly a contract that bound and continues to bind the parties.

The Settlement Agreement establishes the standing of the Delaware Attorney General, as the representative of the Delaware charitable beneficiaries of the Trust, to protect their rights. The First District has twice made this point abundantly clear. In *Gebelein I*, it established that Delaware has standing to sue; in *Gebelein II*, it upheld litigation enforcing the Settlement Agreement. It is beyond reasonable dispute that the Settlement Agreement is and continues to be a legally binding and enforceable agreement.

Indeed, the Settlement Agreement clearly states that future litigation by the parties over its enforcement and other Trust-related concerns was anticipated. The Settlement Agreement says the Attorney General of Delaware and the local state attorney were to "closely observe the operations and activities of the Trust" and

"will desist from filing any new litigation, relating to the subject matter of this agreement, *as long as the Trustees comply with this Agreement*." (Emphasis added). The explicit language of the Settlement Agreement, confirmed by the highlighted language, makes clear that the Attorney General of Delaware and the local state attorney were not to initiate "any new litigation" unless the Trustees did not "comply with this Agreement." In other words, the Settlement Agreement specifically intended that the Attorney General of Delaware was empowered to pursue litigation to enforce its terms against the Trustees if non-compliance were to occur. The only reasonable construction of this language is that the Settlement Agreement created duties and obligations that are enforceable by the "Attorney General of Delaware," who has standing to do so.

The Trustees argue that the 1980 Settlement Agreement was never intended to be an independently binding contract; instead, it was entered into by the parties solely for the trial court to judicially amend the Trust with the settlement terms. They contend the agreement was only entered for this limited purpose and "not as an independently significant agreement with ongoing enforcement rights." Similarly, Nemours argues that the plain language of the 1980 Settlement Agreement reflected that the parties expressly intended for the terms modifying the trust to be implemented through a judgment and that by itself, without the adoption of the judgment modifying the terms of the trust, the 1980 Settlement Agreement is unenforceable.

Neither the text nor the history of litigation under the Settlement Agreement supports these arguments. The parties to the Settlement Agreement agreed "that the terms of this agreement shall become the subject of a judicial order, or final judgment to be entered pursuant to the decision of Circuit Court Judge . . ., as soon as is reasonably possible[.]" This language in no way limits the judgment's enforcement; it would require rewriting the Settlement Agreement and injecting new language to achieve the interpretation the Trust and Nemours advance. For example, the Settlement Agreement could have been written to say that the "parties agree that the terms of this agreement shall be the subject of a final judgment solely for the purposes of modifying the Trust's terms; neither this agreement nor its incorporation into a final

33

judgment creates any enforceable rights by the parties." But no such limitations were included. To the contrary, the Settlement Agreement explicitly envisioned and empowered the enforcement of its terms: the parties were to stand down and not litigate the "subject matter of this agreement, *as long as the Trustees comply with this Agreement.*" Succinctly stated: If the Trustees don't comply, they get sued. The agreement itself thereby contradicts the position taken by Trust and Nemours; moreover, the history of litigation under the Settlement Agreement belies their position. *See, e.g.*, *Gebelein II*, 456 So. 2d at 1238.

Notably, the inclusion of a settlement agreement in a final judgment can serve multiple purposes. It may be done to amend a trust's terms, but it is also a means of enforcing the newly revised terms of the trust. Nothing logically or legally precludes a final judgment from doing both, i.e., chewing gum and walking at the same time. The Settlement Agreement, once judicially approved and made part of the Trust, was enforceable as a contract as First District precedent and the history of litigation under the Settlement Agreement demonstrate.

Additionally, the parties also agreed that the Settlement Agreement would be filed in each of the other cases that were then pending before the trial court, "for consideration and the determination of any issues pending therein." Delaware was also allowed to intervene in a related lawsuit involving the Trust. These provisions support that the Settlement Agreement was no mere one-time modification of the terms of the Trust's terms. Rather, it was an independent contractually enforceable agreement that governed the ongoing relationship of the parties in both the *Gebelein* litigation and beyond.[19]

---

[19] As discussed below, a legislative change to an existing contract may result in a breach of the constitutional protection in the Contract Clause against governmental interference with private agreements, as conceded at oral argument.

34

## B. *Gebelein I* is Binding Precedent

Next, Delaware argues that the trial court erred in holding that *Gebelein I* had been overruled, was wrongly decided, and must be limited to only that specific case without future application. It asserts that by overruling *Gebelein I*, the trial court wrongfully strips Delaware of its vested rights to safeguard the interests of its children and elderly under the trust as beneficiaries of the duPont will. As the next sections explain, each of the purported grounds for jettisoning *Gebelein I* as it applies to the identical parties and claims in this successor case are insupportable.

### 1. Stare Decisis

The importance of stare decisis in our judicial system cannot be overemphasized. It bears noting at the outset that the first trial judge declined to dismiss Count II of Delaware's complaint, concluding that *Gebelein I* was binding precedent thereby allowing Delaware to pursue its breach of trust claims. It is unsurprising that dismissal was declined. That's because the decision in *Gebelein I* is a commanding precedent, the reddest of red cow cases,[20] as it is *identical* in every material respect to this litigation: same parties, same trust, same claim for relief. The sanctity of a judicial precedent is at its most critical point when it involves the *identical* parties who have placed reliance on its stability and enforceability, in this case for over four decades.

Plus, it is not a trial court's prerogative to deviate from appellate precedent. *See Pardo v. State*, 596 So. 2d 665, 667 (Fla. 1992) (citation omitted) ("[I]f the district court of the district in which the trial court is located has decided the issue, *the trial court is bound to follow it*." (emphasis added)).[21] Here, the trial court was

---

[20] *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1390 (11th Cir. 1993) ("The term 'red cow' is used in some legal circles, particularly in Florida, to describe a case that is directly on point, a commanding precedent.").

[21] The trial court, situated in the Fourth Circuit, was required to follow *Gebelein I*, a First District precedent. The recent realignment of the district courts of appeal, which now places the

required to follow *Gebelein I* and its progeny. That's because "a trial court may not overrule or recede from the controlling decision of a district court." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 973 n.4 (Fla. 2009).

For example, in *System Components*, the trial court refused to follow a precedent of the Fourth District based on the Department of Transportation's argument that it had a constitutional duty to not accept a decision of an appellate court that "had erroneously 'legislated' and thereby exceeded its authority." *Id.* at 973; *see also Sys. Components Corp. v. Dep't of Transp.*, 985 So. 2d 687, 689 n.3 (Fla. 5th DCA 2008) (noting the trial court's failure to follow precedent with which it expressed disagreement and attempted to distinguish). The supreme court agreed with the Fifth District, which had concluded "that FDOT's contentions in this regard were totally improper" and that the trial court erred in failing to apply precedent with which it disagreed. *Sys. Components*, 14 So. 3d at 973 n.4.

Under principles of stare decisis, the trial court was required to follow *Gebelein I*. Doing otherwise in this case would negate the underlying foundation upon which the parties themselves built their ongoing relationship. Courts exist to ensure the stability of enforceable rights including those reached in settlement agreements; absent judicial enforcement, settlement agreements serve little purpose. The high bar of stare decisis cannot be easily vaulted lest confidence in the judicial branch is lessened; this principle is particularly applicable in cases involving property and contract rights where reliance interests are at their zenith. *Payne v. Tennessee*, 501 U.S. 808, 828 (1991) ("Considerations in favor of *stare decisis* are at their acme in cases involving property and contract rights, where reliance interests are involved."); *State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020) (citing *Payne*). Just as a district court of appeal must follow supreme court precedent, so too must a trial court follow district court precedent to promote stability and certainty. *Hoffman v. Jones*, 280 So. 2d 431, 434 (Fla. 1973) ("To allow a District Court of Appeal to overrule controlling precedent of this Court would be to create chaos and uncertainty

Fourth Circuit within this Court's jurisdiction, occurred on January 1, 2023, after this case had been fully briefed.

36

in the judicial forum, particularly at the trial level."). The next sections demonstrate why it was erroneous for the trial court to conclude that *Gebelein I* and its progeny were no longer binding precedents.

## 2. Florida Trust Code/Special Interest Doctrine

Adopting the Trustees' position, the trial court held that changes to Florida's trust code implicitly overruled *Gebelein I* and made Florida's attorney general the sole and exclusive public official nationwide to act on behalf of public trust beneficiaries regardless of where they live, thereby tacitly abandoning the special interest doctrine. Both conclusions are legally erroneous.

First of all, a trial court must follow precedent unless it has been overruled by our supreme court, an appellate court en banc recedes from the precedent, or the legislature has clearly expressed disapproval of a precedent by a later statutory enactment. *See, e.g.*, *Wood v. Fraser*, 677 So. 2d 15, 18–19 (Fla. 2d DCA 1996). No clearly expressed legislative disapproval exists for overruling *Gebelein I* or the special interest doctrine.

At most, changes to Florida's trust code merely made Florida's attorney general the exclusive *Florida* public official vested with standing to enforce a charitable trust under the Code. Prior to its revision, the Code stated that a local state attorney had the authority to do so; that authority no longer exists. Ch. 2017-155, § 5, Laws of Fla. The Legislature eliminated the role of local state attorneys, placing that authority with the Florida Attorney General, making her the sole *Florida* official with charitable trust responsibilities. § 736.0110(3), Fla. Stat. (2023). The Code states that "[t]he Attorney General may assert the rights of a qualified beneficiary with respect to a charitable trust" and "has standing to assert such rights in any judicial proceedings." *Id.*

The Code does not state that *only* the Florida Attorney General may vindicate rights with respect to a charitable trust involving out-of-state beneficiaries; had the Legislature intended such a result, it could have said so, but it has not. The Legislature clearly intended to eliminate the official role of state attorneys and shift those responsibilities to the Florida Attorney General, but no

37

statutory language supports such a major change in the law as the renunciation of the special interest doctrine. Neither the legislation nor its history supports that the Legislature intended to overturn the established legal principle that those with a special interest or status in a trust are proper parties and have standing to vindicate their rights. Just as courts don't overrule precedent silently, the Legislature does not jettison a long-standing common law doctrine with nary a whisper of its intent to do so. *Puryear v. State,* 810 So. 2d 901, 905 (Fla. 2002) ("We take this opportunity to expressly state that this Court does not intentionally overrule itself sub silentio.").

The trial court also claimed that section 736.0405(3), Florida Statutes, must be read to exclude persons or entities with a special interest in a public trust. But the statute merely says that the "settlor of a charitable trust, *among others*, has standing to enforce the trust." *Id*. § 736.0405(3) (emphasis added). Far from an exclusion, the highlighted language emphasizes that the legislature recognized that "others" may have standing as well. Indeed, the United States District Court for the Northern District of Florida explicitly relied on this language—as well as *Gebelein I*—in ruling that an individual who financially contributed to, restored, and enhanced a foundation's "primary asset—the plantation—and his central role in carrying out the Foundation's 'principal public charitable activity[,]'" had "adequately alleged a 'special interest' in the Foundation." *Milton v. Milligan*, No. 4:12cv384-RH/CAS, 2013 WL 828607, at *4 (N.D. Fla. Mar. 5, 2013).

The Trust and Nemours argue that amendments to the Code impliedly changed the law, making the Florida Attorney General the exclusive protector of all beneficiaries nationwide and repealing the common law special interest doctrine. But implied repeals of caselaw and established common law legal doctrines are disfavored, much like implied repeals of statutes are disfavored. *Flo-Sun, Inc. v. Kirk*, 783 So. 2d 1029, 1035 (Fla. 2001) (stating that the general rule "is that implied repeals are not favored and will not be upheld in doubtful cases"); *Sweet v. Josephson*, 173 So. 2d 444, 446 (Fla. 1965) (reiterating that "it goes without saying that repeals by implication are not favored"); *State v. Collier Cnty.*, 171 So. 2d 890, 892 (Fla. 1965) (same). That's true where—as

here—nothing supports such a radical change in well-established common law. Not a single word in the trust code or its legislative history establishes an intent to overrule the common law principle that persons and entities with a special interest or status in a charitable trust are proper parties with standing to litigate. To the contrary, the trust code states that the "common law of trusts and principles of equity supplement this code," unless the Code or other Florida law has modified the common law. § 736.0106, Fla. Stat. (entitled "Common law of trusts; principles of equity").

The Trust argues as a policy matter that the special interest doctrine is "outdated" and that *Gebelein I* ought to be overturned. To begin, it is hard to imagine a more entrenched and well-established doctrine than the consideration of whether a plaintiff has a special interest or injury, and thereby standing, to initiate and pursue litigation; it's a test used in many contexts—such as tax, zoning, public nuisance, and statutory challenges[22]—and includes enforcement of charitable trusts where it is the prevailing standard. *See generally* 14 C.J.S. *Charities* § 64 (2023) ("Generally, a person with a special interest, which is an interest beyond the general interest possessed by the public at large, has standing to sue to enforce a charitable trust." (footnotes omitted)). In the public trust context, the doctrine was memorialized over sixty years ago in a leading treatise on the law of trusts. Restatement (Second) of Trusts § 391 (Am. Law Inst. 1959) ("A suit can be maintained for the enforcement of a charitable trust by the Attorney General or

---

[22] *See Fla. Home Builders Ass'n v. Dep't of Lab. & Emp. Sec.*, 412 So. 2d 351, 352 (Fla. 1982); *see also Sch. Bd. of Volusia Cnty. v. Clayton*, 691 So. 2d 1066, 1068 (Fla. 1997) ("The requirement that a taxpayer seeking standing allege a 'special injury' or a 'constitutional challenge' is consistent with long established precedent."); *U.S. Steel Corp. v. Save Sand Key, Inc.*, 303 So. 2d 9, 12–13 (Fla. 1974) (adhering to "the concept of special injury in determining standing," which applies the well settled standard that a plaintiff's injury must differ in kind or degree from that suffered by the community generally); *Rickman v. Whitehurst*, 74 So. 205, 207 (Fla. 1917) (establishing the so-called *Rickman* Rule which states that a person who shows "special damage to his individual interests, distinct from that of every other inhabitant," has standing to maintain an action).

other public officer, or by a co-trustee, or by a person who has a special interest in the enforcement of the charitable trust, but not by persons who have no special interest[.]").

As in other contexts, the reason that a plaintiff must have a special interest or injury in the enforcement of a charitable trust is to prevent "persons having no special interest different from that of the general public" from doing so. *See* 14 C.J.S. *Charities* § 64 ("The purpose of precluding members of the public from enforcing charitable trusts is to protect the trustees from frequent suits based on cursory investigation and brought by irresponsible parties." (footnote omitted)). Because the special interest doctrine is so ingrained in standing analysis and has undergirded the basis for the enforcement of charitable trusts for generations in Florida and elsewhere, it is a particularly ill-suited candidate for the exercise of judicial power to overturn it.

In addition, the position that attorneys general should not have standing to litigate on behalf of beneficiaries specified in an out-of-state trust is a complete turn of the wheel from the Florida Attorney General's amicus brief in *Gebelein I*, which supported Delaware's "standing" to "bring an action in [the circuit court] on behalf of the Delaware beneficiaries of the Trust created under the will of Alfred I. duPont." Noting the "ancient origins" of the authority of state attorneys general to institute litigation on behalf of public trust beneficiaries, the Florida amicus brief stated:

> To deny an attorney general the ability to vindicate the interests of those beneficiaries where they are specifically identified as the primary beneficiaries of a charitable trust *simply because that trust is administered in another state*, would severely inhibit the attorney general's ability to fulfill the fiduciary duty imposed upon him by Anglo-American jurisprudence as early as the sixteenth century. It would also leave the beneficiaries without the representation which they have the right to expect the Attorney General to provide.

40

(Emphasis added). As the highlighted language indicates, it is essential that state attorneys general have standing due to their special interest in protecting public trust beneficiaries from their home states in the courts of other states.

The Trust's policy argument would thwart this principle, which has traditionally been exercised by Florida's Attorney General[23] and others. It is also at odds with a statute they rely upon, which says that the Florida Attorney General "may assert the rights of a qualified beneficiary with respect to a charitable trust" and "has standing to assert such rights *in any judicial proceedings*." § 736.0110(3), Fla. Stat. (emphasis added). The highlighted language does not limit standing to just Florida courts but to judicial proceedings generally, which could be in other states. Thus, the claim that a "foreign" attorney general must be prevented from enforcement of a public trust in Florida is not well taken; indeed, the history of the duPont Trust litigation in Florida courts, done jointly and cooperatively by the Attorneys General of Florida and Delaware, belie this claim.

Finally, the trial court concluded that the language conferring standing in *Gebelein I* was only meant to be applied one-time on a limited basis in that case alone. It pointed to the language in *Gebelein I* that states: "[w]e . . . hold that the Attorney General of

---

[23] As First District Judge Clay Roberts said at oral argument in an interlocutory appeal in this case, "When I was Deputy Attorney General we always took the position that the Florida Attorney General had the authority to go basically anyplace on the planet and intervene on any case where citizens of the State of Florida had an interest on their behalf. So, does the Attorney General not feel like that anymore?" Oral argument at 9:00, *Durden v. Jennings*, Case No. 1D18-2894 (Fla. 1st DCA Jan. 8, 2019) FIRST DISTRICT COURT OF APPEAL, https://1dca.flcourts.gov/ (follow "Oral Arguments" hyperlink; then follow "Oral Argument Video Archives" hyperlink; then search "18-2894"; then follow "18-2894" hyperlink). Of course, an attorney general's office may change its litigation position as a matter of policy, but such a change does not change a state's organic law or its judicial precedent.

Delaware has standing to maintain **_this action_**." According to the trial court, this highlighted language meant "it was not bound to follow [*Gebelein I*] in this case." This misreading of the highlighted language overlooks that *Gebelein I* was followed and relied upon in other cases. *See Gebelein II*. The First District, in *State of Delaware ex rel. Oberly v. Belin*, also confirmed that the Attorney General of Delaware was the proper party to represent the children and elderly of Delaware as beneficiaries of the Trust. 453 So. 2d at 1179.

### 3. *Biden* Is Inapplicable

Next, Nemours and the Trustees argue that the First District decision in *Biden v. Lord*[24] supports the trial court's decision to depart from *Gebelein I*. This argument overlooks the

> fundamental principle announced long ago by our Florida Supreme Court that "[f]or one case to have the effect of overruling another, the same questions must be involved; they must be affected by a like set of facts and a conclusion must be reached in hopeless conflict with that in the former case."

*State ex rel. Garland v. City of W. Palm Beach,* 193 So. 297, 298 (1940); *see Lee v. Williams*, 711 So. 2d 57, 59 n.4 (Fla. 5th DCA 1998) (same) (quoting *Garland*). No "hopeless" conflict exists.

Instead, the *Biden* case is easily distinguishable because it merely held that the trial court's denial of Delaware's attempt to intervene in the trial court twelve years post-judgment was not an abuse of discretion. In *Biden*, the Trustees filed an action in 2004 to modify the trust resulting in a final judgment that redefined "crippled children" and "required the Trustees to distribute three percent of the fair market value of the Trust every year, even if such distribution required taking part of the principal." *Biden*, 147 So. 3d at 635. Eight years later, the Delaware Attorney General

---

[24] Joseph Robinette "Beau" Biden III served as Attorney General of Delaware from 2007 to 2015, passing on shortly after the expiration of his second term.

moved to intervene as an indispensable party and set aside the 2004 final judgment, but the trial court denied the motion finding that Delaware was not an indispensable party and that existing parties would be injured by the intervention. *Id.* The First District's holding in *Biden* dealt with whether the trial court abused its discretion in denying the motion to intervene at such a late date; the decision did not address Delaware's standing or make any binding determination contrary to *Gebelein I*. No conflict, let alone a "hopeless" conflict, exists between *Biden* and *Gebelein I*, which remains binding precedent.

In fact, the panel's analysis in *Biden* confirms that Delaware's Attorney General continues to have standing. *See id.* at 636. The panel noted that "the Delaware Attorney General has a separate action pending in the circuit court concerning the Trust." *Id.* It concluded that "[i]t would be more appropriate for the Delaware Attorney General to seek modification of the Trust in that proceeding rather than attempting to invalidate a judgment that has been final for eight years." *Id.* The panel thereby reaffirmed that the Delaware Attorney General had standing in that separate action, one in which she could seek a modification of the Trust; it clearly had no intention to overrule *Gebelein I* or its progeny.

Moreover, it is well-established that a three-judge panel lacks judicial power to overrule a prior decision of its own court; an en banc decision of the court is necessary to do so. *In re Rule 9.331*, 416 So. 2d 1127, 1128 (Fla. 1982) (noting that intra-district conflict should be resolved by the district courts of appeal sitting en banc and expecting a district court of appeal panel of judges "confronted with precedent with which it disagrees" to suggest an en banc hearing). In reliance on supreme court precedent, the Second District has held that:

> absent an en banc opinion expressly receding from a point of law announced in previous opinions of this court, a trial court should not rely on the expressions of a three-judge panel as a basis to conclude that a previous opinion of another three-judge panel no longer carries the force of law.

*Wood*, 677 So. 2d at 18. Based on this principle, the panel in *Biden* had no judicial authority to overrule *Gebelein I* or any other precedent involving the Delaware Attorney General's standing, the Settlement Agreement's enforceability, or the Trust's responsibilities. Not only did it not overrule precedent, but the panel in *Biden* was powerless to do so. *Gebelein I* and its progeny remain binding precedent.

### 4. *Gebelein I* does not violate separation of powers

Finally, the trial court held that *Gebelein I* was wrongly decided from the start, essentially void from its inception on separation of powers grounds, an argument not made in that case and first raised in this litigation. The premise underlying this conclusion is that the First District in *Gebelein I* was overriding the authority of Florida's attorney general, who—it is contended—had then, and continues to have now, exclusive authority to represent the rights of all beneficiaries of a public trust no matter where they live.

The problems with this argument are many. First, the Florida Attorney General did not make a separation of powers argument in *Gebelein I*. To the contrary, he, along with twenty-nine states, argued exactly the contrary—that every state's attorney general has the standing and authority to appear and vindicate the interests of its home state beneficiaries of a charitable trust even if the *trust is administered in another state*. Second, this policy position—that only the Florida Attorney General may engage in litigation on behalf of all beneficiaries—is of recent vintage. It overlooks that the application of the common law special interest doctrine, which does not infringe on the Florida Attorney General's powers; it simply allows those with a special interest or status to intervene on a limited basis. As such, neither *Gebelein I* nor the special interest doctrine violates separation of powers principles. Instead, they simply apply the common law special interest doctrine, which no court nor the legislature has discredited or overturned. § 736.0106, Fla. Stat. (common law supplements the Florida trust code).

A potential separation of powers problem does exist in this case. If Delaware is powerless to pursue a breach of the Settlement

Agreement, as the Trust and State urge, that would amount to a violation of the contract clauses of the federal and state constitutions by voiding those prior agreements. The Settlement Agreement is a binding and enforceable contract that has formed the basis for the relationship between the parties in this litigation. The trial court essentially nullified the contract by its ruling, overturning *Gebelein I* and the special interest doctrine. Even if *Gebelein I* were now overturned legislatively, it doesn't affect the established and enforceable rights upon which that litigation was based; judicially nullifying them would be, as is conceded, a constitutional violation.

Finally, the claim that Delaware's attorney general cannot represent Delaware beneficiaries because they are no longer defined as "beneficiaries under the Florida Trust Code" misses the point that they are public trust beneficiaries under duPont's will who, by judicial precedent and agreement of the parties, is represented by Delaware. In this regard, Nemours asserts that granting Delaware standing in this case would "pose grave separation-of-powers concerns by overriding the Florida Legislature's statutory design and frustrating the Florida [Attorney General's] constitutional and statutory authority." To overturn an equitably litigated and amicably resolved case—one memorialized in the Settlement Agreement—would itself be a separation of powers violation. *See Bush v. Schiavo*, 885 So. 2d 321, 331 (Fla. 2004) (concluding that an executive order that "effectively reversed a properly rendered final judgment . . . constituted an unconstitutional encroachment on the power that has been reserved for the independent judiciary").

### III.

*Gebelein I* was a commanding precedent of the First District that was binding on the parties and the trial court. No valid reason existed for the trial court to depart from the decision's long-standing principles and holding, particularly in a case that involves the same parties, agreement, and issues. *Gebelein I* remains binding precedent and has ongoing application to the parties to the Settlement Agreement. In conclusion, the trial court erred in dismissing Delaware's breach of contract claim, which was based on enforcement of the Settlement Agreement that formed

45

the now over-four-decades-old relationship between the same parties: the Attorneys General of Delaware and Florida, the Trust, and Nemours. It was also erroneous to deny Delaware the ability to continue to pursue its breach of trust claim by representing Delaware beneficiaries, which was and continues to be its right under *Gebelein I*. The merits of Delaware's claims are entitled to be heard and fairly litigated.

*Epilogue*

A few months after oral argument in March 2023, the foregoing opinion, with the most minor of edits, was prepared to resolve this case. It thoroughly recounts factually and legally the momentous legacy of the duPont family in Florida and the significance of the lengthy history underlying the decades of legal skirmishes over literally billions of dollars between the affected parties; it also emphasizes the history of the 1980 Settlement Agreement and its ongoing importance, now in its fifth decade. A case of this magnitude merits a detailed opinion whose scope and detail reflects this deeply rooted history, recognizes its impact on the medical and charitable communities in Florida and Delaware, and preserves the testamentary intent of Alfred I. duPont and the rule of law. Because the *per curiam* opinion is an abridgement of this opinion, I concur in the result now reached, albeit a year later than should have occurred.

EDWARDS, C.J., concurring in part and dissenting in part.

I concur entirely with the majority's reasoning and holding that Delaware's Attorney General has standing to pursue its claims against the Trustees.

However, I must respectfully dissent with regard to the majority's decision to reinstate Delaware's breach of contract count (Count I) against the Nemours Foundation based upon its alleged violation of the 50% Requirement. That requirement is found only in article F(3) of the Agreement, which reads as follows: "(3) The Trustees agree that at no time will more than fifty percent (50%) annually of the funds distributed by the Trust to Nemours be spent outside the State of Delaware." By its plain language, only the Trustees specifically agreed to abide by the 50% requirement. Nemours, while a party to the Agreement, did not undertake that obligation.

 "Settlements, of course are governed by the rules for interpretation of contracts." *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985). We are guided in the construction of contracts by the "'supremacy-of-text principle,' which means that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" *Fla. Farm Bureau Gen. Ins. v. Worrell*, 359 So. 3d 890, 892 (Fla. 5th DCA 2023) (quoting *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946–47 (Fla. 2020)). We are not free to place a contractual obligation on Nemours that cannot be found in the Agreement. It is not our task to determine why the Agreement was drafted as it was; likewise, it is not within our power to rewrite the forty-four-year-old document. *Saha v. Aetna Cas. & Sur. Co.*, 427 So. 2d 316, 317 (Fla. 5th DCA 1983).

I further dissent to reversal of Count I, the breach of contract claim, as to both the Trustees and Nemours Foundation for an additional reason. A charitable trust whose settlor has died cannot be revised or amended by simple agreement of litigants even if that

47

agreement is in writing. Rather, judicial approval in the nature of a judgment is required. The parties to this appeal have previously resorted to judicial declarations when they found it appropriate to seek amendment, revision, or clarification of the Trust.[25] If judicial approval were not necessary, then why did the parties in this case present the stipulation and agreement to the circuit court for its approval and adoption into a final judgment?

Indeed, in *Biden v. Lord*, 147 So. 3d 632, 636 (Fla. 2014), the First District instructed the DAG that if it wished to seek modification of the Trust, it should do so in an already pending, separate action rather than by tardy intervention. If judicial adoption of an agreement to modify a charitable trust were not required, it is submitted that the First District would not have given that direction. Given that the parties were powerless to vary the terms of the Trust by simple execution of the Agreement, pursuit of a contract action is futile. I express no opinion on whether the DAG could pursue enforcement of the judgment that recognized and adopted the Agreement as that is not before our Court.

Thus, I respectfully dissent to reversing the order dismissing Count I, the breach of contract claim.

---

[25] *See Ball v. Nichols*, Case No. 71-7001 (Fla. 4th Cir. Ct. 1971), clarifying priority of Delaware residents; *Belin v. Shorstein*, Case No. 93-02502-CA (Fla. 4th Cir. Ct. 1993), resulting in final judgments in 1993, later amended in 1996 and 2002 relating to the number of Trustees and their compensation; *Lord v. Shorstein*, Case No. 16-2004-CA-007960 (Fla. 4th Cir. Ct. 2004), resulting in final judgment defining or redefining "crippled children," expanding services to include preventative care, and clarifying the organization and governance of the Nemours Foundation.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____